ATKINS, COMMISSIONER OF THE MASSACHUSETTS
DEPARTMENT OF PUBLIC WELFARE *v.*
PARKER ET AL.

No. 83–1660. Argued November 27, 1984—Decided June 4, 1985*

---

*Together with No. 83–6381, *Parker et al.* v. *Block, Secretary of Agriculture, et al.*, also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in Part I of which MARSHALL, J., joined, *post*, p. 132. MARSHALL, J., filed a dissenting opinion, *post*, p. 157.

*Samuel A. Alito* argued the cause for the federal respondent in No. 83–6381 in support of petitioner in No. 83–1660. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, Leonard Schaitman,* and *Bruce G. Forrest. Ellen L. Janos,* Assistant Attorney General of Massachusetts, argued the cause for petitioner in No. 83–1660. With her on the briefs were *Francis X. Bellotti,* Attorney General,

and *E. Michael Sloman* and *Carl Valvo*, Assistant Attorneys General.

*Steven A. Hitov* argued the cause for Parker et al. in both cases. With him on the briefs was *J. Paterson Rae.*†

JUSTICE STEVENS delivered the opinion of the Court.

In November, and again in December 1981, the Massachusetts Department of Public Welfare mailed a written notice to over 16,000 recipients advising them that a recent change in federal law might result in either a reduction or a termination of their food-stamp benefits. The notice did not purport to explain the precise impact of the change on each individual recipient. The question this case presents is whether that notice violated any federal statute or regulation, or the Due Process Clause of the Fourteenth Amendment. Unlike the District Court and the Court of Appeals, we conclude that there was no violation.

In an attempt to "permit low-income households to obtain a more nutritious diet through normal channels of trade,"[1] Congress created a federally subsidized food-stamp program. The Secretary of Agriculture prescribes the standards for eligibility for food stamps,[2] but state agencies are authorized to make individual eligibility determinations and to distribute the food stamps to eligible households, which may use them to purchase food from approved, retail food stores.[3] The eligibility of an individual household, and the amount of its food-

---

†*Neil Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *Bronson C. La Follette*, Attorney General of Wisconsin, and *F. Thomas Creeron III*, Assistant Attorney General, filed a brief for the State of Illinois et al. as *amici curiae* urging reversal.

*Cynthia G. Schneider* filed a brief for the National Anti-Hunger Coalition as *amicus curiae* urging affirmance.

*Kenneth O. Eikenberry*, Attorney General, and *Charles F. Murphy*, Assistant Attorney General, filed a brief for the State of Washington as *amicus curiae*.

[1] 7 U. S. C. § 2011.

[2] § 2014.

[3] §§ 2013(a), 2020(a).

stamp allotment, are based on several factors, including the size of the household and its income.[4] Certifications of eligibility expire periodically and are renewed on the basis of applications submitted by the households.[5]

Prior to 1981, federal law provided that 20 percent of the household's earned income should be deducted, or disregarded, in computing eligibility.[6] The purpose of the earned-income disregard was to maintain the recipients' incentive to earn and to report income. In 1981 Congress amended the Food Stamp Act to reduce this deduction from 20 percent to 18 percent.[7] That amendment had no effect on households with no income or with extremely low income, but caused a reduction of benefits in varying amounts, or a complete termination of benefits, for families whose income placed them close to the border between eligibility and ineligibility.[8]

On September 4, 1981, the Department of Agriculture issued regulations providing for the implementation of the change in the earned-income disregard and directing the States to provide notice to food-stamp recipients.[9] That directive indicated that the form of the notice might comply with the regulations dealing with so-called "mass changes,"[10]

---

[4] § 2014.

[5] §§ 2012(c), 2014(f), 2015(c).

[6] § 2014(e) (1976 ed., Supp. II).

[7] See 95 Stat. 360, 7 U. S. C. § 2014(e).

[8] The Government states that it is "advised that the reductions involved did not exceed $6 per month for a four-member household if the household remained eligible for benefits." Brief for Federal Respondent 7. It does not indicate where in the record this information is located; nor does it indicate the source of the "advice."

[9] 46 Fed. Reg. 44722 (1981). The regulation provided that the change should begin no later than 90 days from the date of implementation, with October 1, 1981, as the last date for state agencies to begin implementation (absent a waiver).

[10] *Ibid.* The portion of 7 CFR § 273.12(e) (1985), which discusses the notice required for mass changes, provides in relevant part:

"(e) *Mass changes.* Certain changes are initiated by the State or Federal government which may affect the entire caseload or significant

rather than with the regulations dealing with individual "adverse actions."[11]

In November, the Massachusetts Department of Public Welfare (Department) mailed a brief, ambiguously dated notice to all food-stamp recipients with earned income advising them that the earned-income deduction had been lowered from 20 percent to 18 percent and that the change would result in either a reduction or a termination of their benefits. The notice was printed on a card, in English on one side and Spanish on the other. The notice stated that the recipient had a right to request a hearing "if you disagree with this action," and that benefits would be reinstated if a hearing was requested within 10 days of the notice.[12]

On December 10, 1981, petitioners in No. 83–6381 commenced this action on behalf of all Massachusetts households

_____

portions of the caseload. These changes include adjustments to the income eligibility standards, the shelter and dependent care deductions, the Thrifty Food Plan, and the standard deduction; annual and seasonal adjustments to Social Security, SSI, and other Federal benefits, periodic adjustments to AFDC or GA payments; and other changes in the eligibility criteria based on legislative or regulatory actions.

. . . . .

"(2) . . . (ii) A notice of adverse action is not required when a household's food stamp benefits are reduced or terminated as a result of a mass change in the public assistance grant. However, State agencies shall send individual notices to households to inform them of the change. If a household requests a fair hearing, benefits shall be continued at the former level only if the issue being appealed is that food stamp eligibility or benefits were improperly computed."

[11] The section on adverse actions, 7 CFR § 273.13 (1985), provides in relevant part:

"(a) *Use of notice.* Prior to any action to reduce or terminate a household's benefits within the certification period, the State agency shall, except as provided in paragraph (b) of this section, provide the household timely and adequate advance notice before the adverse action is taken."

. . . . .

"(b) *Exemptions from notice.* Individual notices of adverse action are not required when:

"(1) The State initiates a mass change as described in § 273.12(e)."

[12] App. to Pet. for Cert. in No. 83–1660, pp. A. 44 – A. 45; App. 3.

that had received the notice. They alleged that the notice was inadequate as a matter of law and moved for a temporary restraining order. On December 16, 1981, after certifying the action as a class action, and after commenting that the "notice was deficient in that it failed to provide recipients with a date to determine the time in which they could appeal," the District Court enjoined the Department from reducing or terminating any benefits on the basis of that notice.[13]

The Department, in compliance with the District Court's order, mailed supplemental benefits for the month of December to each of the 16,640 class members. It then sent out a second notice, in English and Spanish versions, dated December 26, which stated in part:

" * * * *IMPORTANT NOTICE—READ CAREFULLY* * * *

"RECENT CHANGES IN THE FOOD STAMP PROGRAM HAVE BEEN MADE IN ACCORDANCE WITH 1981 FEDERAL LAW. UNDER THIS LAW, THE EARNED INCOME DEDUCTION FOR FOOD STAMP BENEFITS HAS BEEN LOWERED FROM 20 TO 18 PERCENT. THIS REDUCTION MEANS THAT A HIGHER PORTION OF YOUR HOUSEHOLD'S EARNED INCOME WILL BE COUNTED IN DETERMINING YOUR ELIGIBILITY AND BENEFIT AMOUNT FOR FOOD STAMPS. AS A RESULT OF THIS FEDERAL CHANGE, YOUR BENEFITS WILL EITHER BE REDUCED IF YOU REMAIN ELIGIBLE OR YOUR BENEFITS WILL BE TERMINATED. (FOOD STAMP MANUAL CITATION: 106 CMR:364.400).

*"YOUR RIGHT TO A FAIR HEARING:*
"YOU HAVE THE RIGHT TO REQUEST A FAIR HEARING IF YOU DISAGREE WITH THIS AC-

---

[13] App. to Pet. for Cert. in No. 83–1660, pp. A. 45 – A. 46.

TION. IF YOU ARE REQUESTING A HEARING, YOUR FOOD STAMP BENEFITS WILL BE REINSTATED. . . . IF YOU HAVE QUESTIONS CONCERNING THE CORRECTNESS OF YOUR BENEFITS COMPUTATION OR THE FAIR HEARING PROCESS, CONTACT YOUR LOCAL WELFARE OFFICE. YOU MAY FILE AN APPEAL AT ANY TIME IF YOU FEEL THAT YOU ARE NOT RECEIVING THE CORRECT AMOUNT OF FOOD STAMPS."[14]

Petitioners filed a supplemental complaint attacking the adequacy of this notice, and again moved for a preliminary injunction. In October 1982, the District Court consolidated the hearing on that motion with the trial on the merits and again ruled in petitioners' favor. The District Court found that there was a significant risk of error in the administration of the food-stamp program, particularly with the implementation of the change in the earned-income disregard, and that the failure to provide each recipient with an adequate notice increased the risk of error. In essence, the District Court concluded that the December notice was defective because it did not advise each household of the precise change in its benefits, or with the information necessary to enable the recipient to calculate the correct change; because it did not tell recipients whether their benefits were being reduced or terminated; and because the reading level and format of the notice made it difficult to comprehend.[15] Based on the

---

[14] App. 5. Each recipient was provided with a card that he could mail to obtain a hearing; a recipient could also obtain a hearing by placing a telephone call or by asking for a hearing in person. App. to Pet. for Cert. in No. 83–1660, p. A. 48.

[15] *Id.*, at A. 100. The District Court wrote:

"The risk of erroneous deprivation of benefits is increased in this case by the lack of adequate notice. The December notice did not inform the affected food stamp households of the exact action being taken, that is, whether their food stamp allotment was being reduced or terminated. There was no mention of the amount by which the benefits were being re-

premise that the statutorily mandated reduction or termination of benefits was a deprivation of property subject to the full protection of the Fourteenth Amendment,[16] the court held that the Due Process Clause had been violated.[17]

As a remedy, the District Court ordered the Department "to return forthwith to each and every household in the plaintiff class all food stamp benefits lost as a result of the action taken pursuant to the December notice" between January 1, 1981, and the date the household received adequate notice, had its benefits terminated for a reason unrelated to the change in the earned-income disregard, or had its file recertified.[18] The District Court also ordered that all future food-stamp notices issued by the Department contain various data, including the old and new benefit amounts, and that the Department issue regulations, subject to court approval, governing the form of future food-stamp notices.[19]

The United States Court of Appeals for the First Circuit agreed with the District Court's constitutional holding, indi-

---

duced. And finally, the December notice lacked the information necessary to enable the household to determine if an error had been made. Therefore, without the relevant information to determine whether an error had been made, the risk of an erroneous deprivation is increased." *Id.*, at A. 90 – A. 91.

[16] The District Court concluded:

"It is clear that the entitlement to food stamps benefits is a property interest subject to the full protection of the Fourteenth Amendment. *Goldberg* v. *Kelly*, 397 U. S. 254 (1970). Therefore, given the existence of a constitutionally protected property interest, the question is what process is due." *Id.*, at A. 86.

[17] The District Court also held that the December notice violated the timely notice requirements of 7 U. S. C. § 2020(e)(10) and 7 CFR § 273.12(e)(2)(ii) (1985), App. Pet. for Cert. in No. 83–1660, p. A. 98; that the notice required to implement the earned-income disregard had to comport with 7 CFR § 273.13(a) (1985), App. to Pet. for Cert. in No. 83–1660, p. A. 98, and that the notice violated multilingual notice requirements, *id.*, at A. 104–A. 105.

[18] *Id.*, at A. 101.

[19] *Id.*, at A. 102–104.

cated its belief that Congress could not have "intended a constitutionally deficient notice to satisfy the statutory notice requirement," and thus affirmed the District Court's holding that "the December notice failed to satisfy the notice requirements of 7 U. S. C. § 2020(e)(10) and 7 CFR § 273.12(e)(2) (ii)." *Foggs* v. *Block*, 722 F. 2d 933, 939–940 (1983).[20] The Court of Appeals held, however, that the District Court had erred in ordering a reinstatement of benefits and in specifying the form of future notices.[21]

Petitioners in No. 83–6381 sought review of the Court of Appeals' modification of the District Court's remedy, and the Department, in No. 83–1660, cross-petitioned for a writ of certiorari seeking review of the holding on liability. We granted both the petition and the cross-petition, and invited the Solicitor General to participate in the argument. 467 U. S. 1250 (1984). We conclude that the notice was lawful, and therefore have no occasion to discuss the remedy issue that the petition in No. 83–6381 presents. Because there would be no need to decide the constitutional question if we found a violation of either the statute or the regulations,[22] we first consider the statutory issue.

## I

The only reference in the Food Stamp Act to a notice is contained in § 2020(e), which outlines the requirements of a state plan of operation. Subsection (10) of that section provides that a state plan must grant a fair hearing, and a prompt determination, to any household that is aggrieved by

---

[20] However, the Court of Appeals disagreed that the December notice failed to satisfy the notice requirements of 7 CFR § 273.13(a) (1985). *Foggs* v. *Block*, 722 F. 2d, at 940.

[21] *Id.*, at 941.

[22] *Escambia County, Florida* v. *McMillan*, 466 U. S. 48, 51 (1984) *(per curiam)* ("normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case"); *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring).

the action of a state agency. A proviso to that subsection states that any household "which timely requests such a fair hearing after receiving individual notice of agency action reducing or terminating its benefits" shall continue to receive the same level of benefits until the hearing is completed.[23]

The language of the proviso does not itself command that any notice be given, but it does indicate that Congress assumed that individual notice would be an element of the fair-hearing requirement. Thus, whenever a household is entitled to a fair hearing, it is appropriate to read the statute as imposing a requirement of individual notice that would enable the household to request such a hearing. The hearing requirement, and the incidental reference to "individual notice," however, are by their terms applicable only to "agency action reducing or terminating" a household's benefits. Therefore, it seems unlikely that Congress contemplated individual hearings for every household affected by a general change in the law.

The legislative history of § 2020(e)(10) sheds light on its meaning. As originally enacted in 1964, the Food Stamp Act contained no fair-hearing requirement. See 78 Stat. 703–709. In 1971, however, in response to this Court's deci-

---

[23] Title 7 U. S. C. § 2020(e)(10) provides, in relevant part:

"The State plan of operation . . . shall provide . . .

. . . . .

"(10) for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the State agency under any provision of its plan of operation as it affects the participation of such household in the food stamp program or by a claim against the household for an overissuance: *Provided*, That any household which timely requests such a fair hearing after receiving individual notice of agency action reducing or terminating its benefits within the household's certification period shall continue to participate and receive benefits on the basis authorized immediately prior to the notice of adverse action until such time as the fair hearing is completed and an adverse decision rendered or until such time as the household's certification period terminates, whichever occurs earlier . . . ."

sion in *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), Congress amended the Act to include a fair-hearing provision,[24] and in the Food Stamp Act of 1977, § 2020(e)(10) was enacted in its present form.[25] The legislative history of the Food Stamp Act of 1977 contains a description of the then-existing regulations, which were promulgated after the 1971 amendment, and which drew a distinction between the requirement of notice in advance of an "adverse action" based on the particular facts of an individual case, on the one hand, and the absence of any requirement of individual notice of a "mass change," on the other.[26] That history contains no suggestion that Congress intended to eliminate that distinction; to the contrary, Congress expressly recognized during the period leading to the enactment of the Food Stamp Act of 1977 the distinction between the regulatory requirement regarding notice in the case of an adverse action and the lack of such a requirement in the case of a mass change.[27] Read against this background, the relevant statutory language—which does not

---

[24] 84 Stat. 2051; see H. R. Rep. No. 95–464, pp. 285–286 (1977); 7 U. S. C. § 2019(e)(8) (1976 ed.) (state agency must provide "for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of a State agency").

[25] 91 Stat. 972.

[26] See H. R. Rep. No. 95–464, at 285–289 (summarizing the existing rules governing fair hearings).

[27] *Id.*, at 289 ("The Committee bill would retain the fair hearings provision of the law intact and would encourage the Department to enforce its excellent regulations and instructions on the subject. . . . The Department should also be certain that, although its regulations do not require individual notice of adverse action when mass changes in program benefits are proposed, they should require the states to send precisely such notices well in advance when the massive changes mandated by this bill are about to be implemented so that the individuals affected are fully aware of precisely why their benefits are being adversely affected. Hearings would, of course, be unnecessary in the absence of claims of factual error in individual benefit computation and calculation. All states should be overseen to be certain that their individual notices in non-mass change adverse action contexts recite the household's fair hearing request rights").

itself mandate any notice at all but merely assumes that a request for a hearing will be preceded by "individual notice of agency action"—cannot fairly be construed as a command to give notice of a general change in the law.[28]

Nor can we find any basis for concluding that the December notice failed to comply with the applicable regulations. Title 7 CFR § 273.12(e)(2)(ii) (1984) provides:

> "(ii) A notice of adverse action is not required when a household's food stamp benefits are reduced or terminated as a result of a mass change in the public assistance grant. However, State agencies shall send individual notices to households to inform them of the change. If a household requests a fair hearing, benefits shall be continued at the former level only if the issue being appealed is that food stamp eligibility or benefits were improperly computed."

This regulation reflects the familiar distinction between an individual adverse action and a mass change. The statement that a notice of adverse action is not required when a change of benefits results from a mass change surely implies that individual computations are not required in such cases. The two requirements that are imposed when a mass change occurs are: (1) that "individual" notice be sent and (2) that it "inform them of the change." In this case, a separate individual notice was sent to each individual household and it did "inform them of the change" in the program that Congress had mandated. Since the word "change" in the regulation

---

[28] Prior to the enactment of the Food Stamp Act of 1977, although individual notices of adverse action were not required by the regulations when mass changes in benefits were instituted because of changes in the law affecting, among other items, income standards or other eligibility criteria, see 7 CFR § 271.1(n)(2)(i) (1975), the States were required to "publicize the possibility of a change in benefits through the various news media or through a general notice mailed out with [food stamp allotment] cards and with notices placed in food stamp and welfare offices." § 271.1(n)(3); see also 39 Fed. Reg. 25996 (1974).

plainly refers to the "mass change," the notice complied with the regulation.[29]

## II

Since the notice of the change in the earned-income disregard was sufficient under the statute and under the regulations, we must consider petitioners' claim that they had a constitutional right to advance notice of the amendment's specific impact on their entitlement to food stamps before the statutory change could be implemented by reducing or terminating their benefits. They argue that an individualized calculation of the new benefit was necessary in order to avoid the risk of an erroneous reduction or termination.

The record in this case indicates that members of petitioners' class had their benefits reduced or terminated for either or both of two reasons: (1) because Congress reduced the earned-income disregard from 20 percent to 18 percent; or (2) because inadvertent errors were made in calculating benefits. These inadvertent errors, however, did not necessarily result from the statutory change, but rather may have been attributable to a variety of factors that can occur in the administration of any large welfare program.[30] For ex-

---

[29] It may well be true, as petitioners argue, that the computerized data in the Department's possession made it feasible for the agency to send an individualized computation to each recipient, and that such a particularized notice would have served the Commonwealth's interest in minimizing or correcting predictable error. What judges may consider common sense, sound policy, or good administration, however, is not the standard by which we must evaluate the claim that the notice violated the applicable regulations.

Moreover, present regulations protect the food-stamp household by providing, upon request, the ongoing right to access to information and materials in its case file. 7 CFR § 272.1(c)(2) (1985). Further, upon request, specific materials are made available for determining whether a hearing should be requested, § 273.15(i)(1). If a hearing is requested, access to information and materials concerning the case must be made available prior to the hearing and during the hearing, § 273.15(p)(1).

[30] See App. to Pet. for Cert. in No. 83–1660, pp. A. 50–A. 52 (Cecelia Johnson), A. 53 (Gill Parker), A. 55 (Stephanie Zades), A. 55–A. 56

ample, each of the named petitioners, presumably represent-
ative of the class, see Fed. Rule Civ. Proc. 23(a), appealed
a reduction in benefits. None identified an error resulting
from the legislative decision to change the earned-income
disregard. But even if it is assumed that the mass change
increased the risk of erroneous reductions in benefits, that
assumption does not support the claim that the actual notice
used in this case was inadequate. For that notice plainly
informed each household of the opportunity to request a fair
hearing and the right to have its benefit level frozen if a
hearing was requested. As the testimony of the class repre-
sentatives indicates, every class member who contacted the
Department had his or her benefit level frozen, and received
a fair hearing, before any loss of benefit occurred. Thus,
the Department's procedures provided adequate protection
against any deprivation based on an unintended mistake. To
determine whether the Constitution required a more detailed
notice of the mass change, we therefore put the miscella-
neous errors to one side and confine our attention to the
reductions attributable to the statutory change.

Food-stamp benefits, like the welfare benefits at issue in
*Goldberg* v. *Kelly*, 397 U. S. 254 (1970), "are a matter of
statutory entitlement for persons qualified to receive them."
*Id.*, at 262 (footnote omitted). Such entitlements are ap-
propriately treated as a form of "property" protected by the
Due Process Clause; accordingly, the procedures that are
employed in determining whether an individual may continue
to participate in the statutory program must comply with
the commands of the Constitution. *Id.*, at 262–263.[31]

---

(Madeline Jones). By hypothesis, an inadvertent error is one that the De-
partment did not anticipate; for that reason, the Department could not give
notice of a reduction that was simply the consequence of an unintended
mistake.

[31] Thus, in *Mathews* v. *Eldridge*, 424 U. S. 319, 332 (1976), this Court
wrote:

"Procedural due process imposes constraints on governmental decisions
which deprive individuals of 'liberty' or 'property' interests within the

This case, however, does not concern the procedural fairness of individual eligibility determinations. Rather, it involves a legislatively mandated substantive change in the scope of the entire program. Such a change must, of course, comply with the substantive limitations on the power of Congress, but there is no suggestion in this case that the amendment at issue violated any such constraint. Thus, it must be assumed that Congress had plenary power to define the scope and the duration of the entitlement to food-stamp benefits, and to increase, to decrease, or to terminate those benefits based on its appraisal of the relative importance of the recipients' needs and the resources available to fund the program. The procedural component of the Due Process Clause does not "impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits." *Richardson* v. *Belcher*, 404 U. S. 78, 81 (1971).

The congressional decision to lower the earned-income deduction from 20 percent to 18 percent gave many food-stamp households a less valuable entitlement in 1982 than they had received in 1981. But the 1981 entitlement did not include any right to have the program continue indefinitely at the same level, or to phrase it another way, did not include any right to the maintenance of the same level of property entitlement. Before the statutory change became effective, the existing property entitlement did not qualify the legislature's power to substitute a different, less valuable entitlement at a later date. As we have frequently noted: "[A] welfare recipient is not deprived of due process when the legislature

meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. The Secretary does not contend that procedural due process is inapplicable to terminations of Social Security disability benefits. He recognizes, as has been implicit in our prior decisions, *e. g.*, *Richardson* v. *Belcher*, 404 U. S. 78, 80–81 (1971); *Richardson* v. *Perales*, 402 U. S. 389, 401–402 (1971); *Flemming* v. *Nestor*, 363 U. S. 603, 611 (1960), that the interest of an individual in continued receipt of these benefits is a statutorily created 'property' interest protected by the Fifth Amendment."

adjusts benefit levels. . . . [T]he legislative determination provides all the process that is due."[32]

The participants in the food-stamp program had no greater right to advance notice of the legislative change—in this case, the decision to change the earned-income disregard level—than did any other voters.[33] They do not claim that there was any defect in the legislative process. Because the substantive reduction in the level of petitioners' benefits was the direct consequence of the statutory amendment, they have no basis for challenging the procedure that caused them to receive a different, less valuable property interest after the amendment became effective.

The claim that petitioners had a constitutional right to better notice of the consequences of the statutory amendment is without merit. All citizens are presumptively charged with knowledge of the law, see, *e. g., North Laramie Land Co.* v. *Hoffman*, 268 U. S. 276, 283 (1925). Arguably that presumption may be overcome in cases in which the statute does not allow a sufficient "grace period" to provide the persons affected by a change in the law with an adequate opportunity to become familiar with their obligations under it. See *Texaco, Inc.* v. *Short*, 454 U. S. 516, 532 (1982). In this case, however, not only was there a grace period of over 90

---

[32] *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 432–433 (1982); see also *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 174 (1980); *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 575 (1979); *Flemming* v. *Nestor*, 363 U. S. 603, 608–611 (1960).

[33] Cf. *Bi-Metallic Investment Co.* v. *State Bd. of Equalization*, 239 U. S. 441, 445 (1915) ("Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule").

days before the amendment became effective, but in addition, every person affected by the change was given individual notice of the substance of the amendment.[34]

As a matter of constitutional law there can be no doubt concerning the sufficiency of the notice describing the effect of the amendment in general terms. Surely Congress can presume that such a notice relative to a matter as important as a change in a household's food-stamp allotment would prompt an appropriate inquiry if it is not fully understood. The entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny. To contend that this notice was constitutionally insufficient is to reject that premise.[35]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[34] Thus, even under the position espoused in dissent in *Texaco*, there would be no merit to the claim in this case. As JUSTICE BRENNAN wrote: "As a practical matter, a State cannot afford notice to every person who is or may be affected by a change in the law. But an unfair and irrational exercise of state power cannot be transformed into a rational exercise merely by invoking a legal maxim or presumption. If it is to survive the scrutiny that the Constitution requires us to afford laws that deprive persons of substantial interests in property, an enactment that relies on that presumption of knowledge must evidence some rational accommodation between the interests of the State and fairness to those against whom the law is applied." 454 U. S., at 544.

[35] In the case before us, the constitutional claim is particularly weak because the relevant regulations provided that any recipient who claimed that his benefit had been improperly computed as a result of the change in the income deduction was entitled to a reinstatement of the earlier benefit level pending a full individual hearing. 7 CFR § 273.12(e)(2)(ii) (1985). Petitioners do not contend that there was a failure to comply with this regulation. This, of course, would be a different case if the reductions were based on changes in individual circumstances, or if the reductions were based on individual factual determinations, and notice and an opportunity to be heard had been denied.

132 .

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins as to Part I, dissenting.

When the Massachusetts Department of Public Welfare (Department) implemented the 1981 statutory reduction in food stamp benefits for persons with earned income, it sent out form notices telling over 16,000 recipients that their benefits would be "reduced . . . or . . . terminated" without specifying which. App. 5. The notices contained no information about any particular recipient's case. The District Court declared the notices unlawful under the Due Process Clause as well as the relevant regulation and statute "because . . . [they] did not contain the individual recipient's old food stamp benefit amount, new benefit amount, or the amount of earned income that was being used to compute the change."[1] The Court of Appeals agreed, finding the notices statutorily and "constitutionally deficient" because they "failed to inform." *Foggs* v. *Block*, 722 F. 2d 933, 940 (CA1 1983). The Court today reverses, finding that "individual computations" are not required by regulation, statute, or Constitution. *Ante*, at 126. I disagree with the Court's interpretation of all three authorities. Accordingly, I dissent.

## I

Title 7 CFR § 273.12(e)(2)(ii) (1985) requires that "when a household's food stamp benefits are reduced or terminated as a result of a mass change . . . [s]tate agencies shall send individual notices to households to inform them of the change."[2]

---

[1] Order, *Foggs* v. *Block*, No. 81–0365–F, p. 2 (Mass., Mar. 24, 1982), reprinted in App. to Pet. for Cert. in No. 83–1660, p. 100 (hereinafter Pet. App.).

[2] The regulation provides in full:

"A notice of adverse action is not required when a household's food stamp benefits are reduced or terminated as a result of a mass change in the public assistance grant. However, State agencies shall send individual notices to households to inform them of the change. If a household requests a fair hearing, benefits shall be continued at the former level only if the issue being appealed is that food stamp eligibility or benefits were improperly computed."

When Congress reduced the statutory earned-income deduction in 1981, the Secretary of Agriculture ordered state agencies implementing the change to provide the "individual notices" required by this regulation. 46 Fed. Reg. 44722 (1981). Both courts below held, however, that the vague form notices in this case failed to fulfill the "individual notice" requirement. 722 F. 2d, at 940; Pet. App. 98. Although the phrase apparently has never been administratively defined,[3] I believe the logic of the regulation, as well as its history and evident function in the administrative scheme, requires inclusion of precisely the sort of individualized information found necessary by the District Court.

First, the sentence in § 273.12(e)(2)(ii) that requires "individual notices" of mass changes is immediately followed by a second requirement:

"If a household requests a fair hearing [after receiving a mass change notice], benefits shall be continued at the former level *only if the issue being appealed is that food stamp eligibility or benefits were improperly computed.*" 7 CFR § 273.12(e)(2)(ii) (1985) (emphasis added).

---

[3] The record contains no evidence that food stamp program authorities have ever advanced a particular construction of the phrase prior to this litigation. Indeed, in his opening brief to this Court, the Secretary did not address the regulatory argument, but contended instead that "any argument, independent of the constitutional argument, that the Massachusetts notice was in violation of the Food Stamp Act or the 'mass change' regulations" should be left open to the recipients on remand. Brief for Federal Respondent 44, n. 38. Thus the Secretary's position on the meaning of the "individual notice" regulation was not presented until his reply brief was filed. Because this interpretation apparently has been developed *pendente lite*, the normal canon requiring deference to regulatory interpretations made by an agency that administers a statute, *e. g., Jewett* v. *Commissioner*, 455 U. S. 305, 318 (1982), has no application here. See *Motor Vehicle Mfrs. Assn.* v. *State Farm Mutual Automobile Ins. Co.*, 463 U. S. 29, 50 (1983) ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action"); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 422 (1971) (opinion of Black, J.) (rejecting "too-late formulations, apparently coming from the Solicitor General's office").

The Court quotes this language, *ante,* at 126, and then ignores it. It seems apparent, however, that an aggrieved food stamp recipient cannot possibly contend in good faith, let alone demonstrate, that his request for a hearing is based on a claim that his benefits have been "improperly computed" if the only notice he receives tells him nothing at all about the computation or new amount of the benefit.[4] Moreover, state agencies cannot possibly exercise their discretion under this regulation to decide not to continue benefits if the requestor cannot rationally specify his appeal grounds.[5] Unless this final provision of the mass change regulation at issue is to be rendered effectively meaningless, the individual notices mandated for a mass change must include the minimum of individualized data necessary for a recipient to surmise, at least, that his benefits have been miscalculated. That minimum amount of data is all that the District Court required in these cases.[6]

---

[4] As the Court of Appeals noted, "[t]hese recipients may have been well informed about their right to appeal, but they did not have enough information to know whether or not to exercise that right." *Foggs* v. *Block,* 722 F. 2d 933, 939 (CA1 1983).

[5] Similar delegations of authority elsewhere in the food stamp regulations are likewise called into question by the Court's ruling today. See 7 CFR § 273.15(k)(1) (1985) ("When benefits are reduced or terminated due to a mass change, participation on the prior basis shall be reinstated only if the issue being contested is that food stamp . . . benefits were improperly computed or that Federal law or regulation is being misapplied or misinterpreted by the State agency"); § 271.7(f) ("State agencies shall not be required to hold fair hearings unless the request for a fair hearing is based on a household's belief that its benefit level was computed incorrectly . . . or that the rules were misapplied or misinterpreted").

[6] Apart from its discussion of the regulation, the Court emphasizes the fact that the form notice mailed by the Department in these cases informed recipients that "[y]ou have the right to request a fair hearing if you disagree with this action." *Ante,* at 128. It seems relatively clear, however, that under 7 CFR § 273.15(k)(2)(ii) (1985) and, perhaps, § 271.7(f), aggrieved households have no "right" to a hearing based merely on disagreement with a change in the law. Perhaps the Court intends either to limit its approval of form notices to circumstances in which a state agency allows appeals and fair hearings no matter what the reason, or to require that ap-

A careful examination of the history of §273.12(e)(2)(ii) also suggests that "individual notices" mean notices containing some individualized information. The Secretary's food stamp regulations originally required that, "[p]rior to *any* action to terminate or reduce a household's program benefits," state agencies had to give each household "in detail the reasons for the proposed action." 7 CFR §271.1(n) (1972) (emphasis added). This notice requirement made no exception for "mass changes" in the law. In 1974, however, the Secretary granted state agencies the option of providing "general notice" of mass changes, either by a notice "mailed to all recipients," 39 Fed. Reg. 25996 (1974), or by pervasive publicity.[7] The form notice used in these cases presumably would have met this "general notice" requirement if general notice had been all that was required in 1981. In 1978, however, the Secretary subdivided the mass change regulation to address different types of changes. 43 Fed. Reg. 47915–47916 (1978). Subsection (e)(1) paralleled the 1974 mass change regulation, permitting notice of certain state and federal adjustments by pervasive publicity, "general notice mailed to households," or "individual notice." Subsection (e)(2) was new, however, and required "individual notices to households to inform them of the change."[8] Although the

peals must always be permitted if mass change notices are vague. Otherwise, nothing in the Court's opinion would appear to prohibit state agencies from omitting such appeal rights in the future while still providing no more than the uninformative notice approved by the Court today.

[7] "When [a notice of adverse action] is not required . . . , the State agency shall publicize the possibility of a change in benefits through the various news media or through a general notice mailed out with ATP cards and with notices placed in food stamp and welfare offices." 7 CFR §271.1(n)(3) (1975).

[8] The relevant provisions stated:

"(e) *Mass changes.* . . .

"(1) *Federal adjustments to eligibility standards, allotments, and deductions, State adjustments to utility standards.* . . .

"(ii) Although a notice of adverse action is not required, State agencies may send an individual notice to households of these changes. State agencies shall publicize these mass changes through the news media; posters in

difference between "general notices mailed to households" and "individual notices" was never defined by the Secretary, he directed that notice of the 1981 earned-income deduction change be given pursuant to subsection (e)(2), thereby requiring "individual" as opposed to "general" notice.

In the absence of some contrary indication, normal construction of language requires the conclusion that the Secretary employed different terms in the same regulation to mean different things. See *Crawford* v. *Burke*, 195 U. S. 176, 190 (1904); R. Dickerson, The Interpretation and Application of Statutes 224–225 (1975). And it is clear that the difference between the two types of notice must lie in their informational content, "general" versus "individual," because *both* types of notice must be mailed to individual households.[9] "General notices mailed to households" required no more than a form letter of identical content mailed to each of a large number of affected households; in contrast, "individual notice" going to many households must imply some more particularized, "individual" content.

Finally, the Court argues that the regulatory decision not to require a "notice of adverse action" for mass changes "surely implies" a decision to forgo "individual computations" as well. *Ante*, at 126. No such implication is logically required, however. The Court apparently fails to understand that "notice of adverse action" is a technical term of art used in the food stamp regulations to describe a special type of

---

certification offices, issuance locations, or other sites frequented by certified households; or general notices mailed to households. . . . .

"(2) *Mass changes in public assistance.* . . .

" (ii) A notice of adverse action is not required when a household's food stamp benefits are reduced or terminated as a result of a mass change in the public assistance grant. However, State agencies shall send individual notices to households to inform them of the change. . . ." 7 CFR § 273.12(e) (1979).

[9] Thus the fact that "a separate individual notice was sent to each individual household," *ante*, at 126, proves nothing.

notice containing other information besides "the reason for the proposed action."[10] Thus when the Secretary proposed § 273.12(e)(2)(ii) in 1978, he distinguished "individual" mass change notice from a "notice of adverse action" by noting the information that a mass change notice need not contain:

> "Although households are not entitled to a notice of adverse action for mass changes[,] the regulations propose that States send households an individual notice which informs the household of the change but does not grant the household continuation rights if the household appeals the State agency action. In this way, households are advised of the change and can adjust household budgets accordingly." 43 Fed. Reg. 18896 (1978).[11]

Nothing was said to suggest that individual computations were not required in either type of notice. Indeed, by stating a purpose of providing affected households sufficient information so that they could adjust their budgets, the plain implication is to the contrary: each household was to be notified of mass changes in individual terms. It is difficult

---

[10] In 1981, when the Department acted in this case, a "notice of adverse action" was required to contain

"in easily understandable language . . . [t]he proposed action; the reason for the proposed action; the household's right to request a fair hearing; the telephone number and, if possible, the name of the person to contact for additional information; the availability of continued benefits; and the liability of the household for any overissuances received while awaiting a fair hearing . . . . If there is an individual or organization available that provides free legal representation, the notice shall also advise the household of the availability of the service." 7 CFR § 273.13(a)(2) (1981).

[11] The Secretary erred in stating that households affected by mass changes had no right to continued benefits, since the regulations proposed on the same day clearly specified a right to continued benefits "if the issue being appealed is the computation of benefits." 43 Fed. Reg. 18931 (1978). But unlike a notice of adverse action, the proposed mass change notice was not required to inform recipients of that right.

to imagine how one could otherwise adjust one's household budget "accordingly."[12]

As far as I can tell, there has been no contemporaneous or consistent administrative interpretation of the regulation at issue; indeed, there has been no interpretation at all. Based on the language, function, and history of the regulation itself, however, any logical implication to be drawn is that the "individual notice" required by § 273.12(e)(2)(ii) comprehends some amount of individualized benefit data.[13] Conscious as well of the constitutional questions otherwise raised, I would affirm the judgment below on this ground alone.[14]

## II

I can agree with the Court that the relevant statutory section, 7 U. S. C. § 2020(e)(10), may not of itself require "indi-

---

[12] To the extent that the Court suggests that there is a difference between types of action ("adverse" as opposed to "mass") rather than in types of notice, ante, at 126, or that notice is required of "individual adverse action[s]" but not of mass changes, ibid., it is apparent that the Court misapprehends the "familiar distinction between the individual adverse action and a mass change." Ibid. In terms of effect on the individual, there is no difference under either label. The "action"—a reduction in benefits—is exactly the same. Moreover, households affected in either case must receive "individual notice" and have some right to a fair hearing. The only difference is in the number of recipients affected and the amount of additional information their notices must contain.

[13] It should not go unnoted that just as the concept of "individual notice" silently appeared in the 1978 mass change regulations, the concept of "general" notice has now disappeared from the regulations without explanation. See 46 Fed. Reg. 44712, 44726 (1981) (proposing new § 273.12(12)(e)); 7 CFR § 273.12(e) (1985). It is ironic that although the concept of "general notice mailed to households" has thus passed from the regulatory scheme without a murmur, the majority today reincarnates it under the label of "individual notice," by approving the vague form notices that were used in these cases.

[14] The recipients' petition for certiorari in No. 83–6381, questioning the Court of Appeals' vacation of the District Court's injunctive relief, is not considered by the Court today. See ante, at 123. I need say only that on this record, I do not find that the Court of Appeals exceeded its remedial discretion.

vidual computations." The Court goes beyond this holding, however, to suggest that § 2020(e)(10) permits no notice at all of reductions based on legislated changes in benefit levels. *Ante,* at 126. Because all parties concede that some form of notice was required, the Court's broader statutory discussion is unnecessary to its decision. I find the Court's suggestion to be an erroneous reading that will cause needless confusion for food stamp administrators and recipients alike.

Although the Food Stamp Act of 1964, 78 Stat. 703, as amended, 7 U. S. C. §§ 2011–2029, is federally supervised, it is administered largely by separate agencies of the States.[15] Thus reductions in food stamp benefit levels, even if federally mandated, can be implemented only by state agencies. Section 2020(e)(10) requires that when a state agency acts, it must provide "for the granting of a fair hearing and a prompt determination thereafter to *any* household aggrieved by the action of the state agency under *any* provision of its plan of operation . . ." (emphasis added). It further mandates continuation of the prior level of food stamp benefits pending decision for "any household which timely requests such a fair hearing *after receiving individual notice of agency action reducing or terminating its benefits*" (emphasis added). As the Secretary acknowledges, the plain language of § 2020(e)(10) *"presupposes* the existence of notice." Reply Brief for Federal Respondent 11. The Court's conclusion that § 2020(e)(10) "does not itself mandate any notice at all," *ante,* at 125–126, is thus true only in the formalistic sense that words of command are not used. A congressional presupposition that notice will be sent, expressed in a statute directed to state agencies, can have no different legal effect than would a straightforward command.

---

[15] Title 7 U. S. C. § 2020(d) directs that each "State agency . . . shall submit for approval" by the Secretary of Agriculture a "plan of operation specifying the manner in which [the food stamp] program will be conducted within the State in every political subdivision." State agencies are directly "responsible for the administration of the program within [each] State." 7 CFR § 271.4(a) (1985).

No distinction between types of "agency action"—mass or individual—appears in the language of § 2020(e)(10), and the statute's legislative history demonstrates that no distinction was intended. The controlling House Report explained that after *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), fair hearings would be required in all cases where a food stamp claimant will be "aggrieved" by *any* agency action, "whether it be a termination or reduction of benefits, a denial of an application for benefits, or other negative action. . . ." H. R. Rep. No. 95–464, p. 285 (1977). The Report went on to recite Congress' understanding that notice of all such "negative actions" was normally provided in all cases,[16] and indeed, such was the administrative practice in 1977. Although "notices of adverse action" were not always required, the 1977 regulations required *some* form of notice even for "mass changes." 7 CFR §§ 271.1(n)(2) and (3) (1977). Congress was thus well aware of, and legislated on the basis of, the contemporaneous administrative practice of providing notice of mass changes, and must be presumed to have intended to maintain that practice absent some clear indication to the contrary. *Haig* v. *Agee*, 453 U. S. 280, 297–298 (1981).[17]

Aside from language and legislative history, the logic of the statutory scheme is distorted by the Court's suggestion

[16] "Each household must be notified in a timely manner usually ten days prior to the time the agency's decision will take effect." H. R. Rep. No. 95–464, p. 285 (1977); accord, S. Conf. Rep. No. 95–418, p. 197 (1977) (adopting House bill which requires "State agency notice of reduction or termination of [a household's] benefits").

[17] The Court rests its statutory argument on its view of the regulatory "background," which allegedly included a "distinction between the regulatory requirement regarding notice in the case of an adverse action and the *lack of such a requirement* in the case of a mass change." *Ante*, at 125 (emphasis supplied). No such distinction existed, however. The regulations in effect in 1977 plainly stated a requirement of notice of mass changes, 7 CFR § 271.1(n)(3) (1977), as the Court itself notes, *ante*, at 126, n. 28. Congress' approval of the 1977 administrative practice, therefore, cannot support the Court's suggestion that Congress thereby approved of no notice at all in the mass change context.

that notice is not required when mass reductions result from legislation. Notice is, of course, "an element of the fair hearing requirement" of § 2020(e)(10), *ante,* at 124, because it allows recipients whose benefits will be reduced or terminated to determine whether or not to request a fair hearing. Cf. *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 171–172 (1951) (Frankfurter, J., concurring) ("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice"). Congress expressed its view in 1977 that there would be little occasion to claim a fair hearing when legislative changes in benefit levels were implemented: "Hearings would, of course, be unnecessary *in the absence of claims of factual error in individual benefit computation and calculation.*" H. R. Rep. No. 95–464, at 289 (emphasis added).[18] Similarly, Congress directed that if in the course of a fair hearing "a determination is made that the sole issue being appealed is . . . *not a matter of fact or judgment relating to an individual case,*" then benefits need not be continued under the proviso of § 2020(e)(10). *Id.,* at 286 (emphasis added). These very statements, however, demonstrate Congress' understanding that households affected by mass changes could request a fair hearing, and were *entitled* to a hearing if their claim was, among other things, miscalculation of benefits.[19] The Court does not discuss these legislative remarks. But congres-

---

[18] We previously have affirmed the view that because the distinction between factual and policy-based appeals is often difficult to identify, the Due Process Clause constrains state agencies to err on the side of allowing hearings in doubtful or ambiguous cases. *Carleson* v. *Yee-Litt,* 412 U. S. 924 (1973) (summarily aff'g *Yee-Litt* v. *Richardson,* 353 F. Supp. 996 (ND Cal.)).

[19] The Court's statement that "it seems unlikely that Congress contemplated individual hearings for every household affected by a general change in the law," *ante,* at 124, is thus unobjectionable, but it has no apparent bearing on whether Congress contemplated *notice* of mass reductions so that fair hearings could be requested in appropriate cases before benefits are cut off.

sional discussion of guidelines for winnowing appeals simply makes no sense if no notice at all of mass reductions was intended.

Notice of reductions in benefit levels is thus the necessary predicate to implementation of the statutory fair hearing requirement. Indeed, the Court apparently accepts this view, stating that "whenever a household is entitled to a fair hearing, it is appropriate to read the statute as imposing a requirement of individual notice that would enable the household to request such a hearing." *Ante*, at 124. It is clear, however, that Congress intended and the regulations guarantee that mass reductions rightfully may be appealed if the claim is miscalculation. Yet the Court concludes there is no statutory "command to give notice of a general change in the law." *Ante*, at 126. This conclusion may generally be correct with regard to *enactment* of changes in the law, see *Texaco, Inc.* v. *Short*, 454 U. S. 516 (1982), but the plain terms of § 2020(e)(10) require notice of "agency action" taken to *implement* the law, if that action will result in "reduc[tion] or terminat[ion] of . . . benefits." Because legislated mass changes, like any other changes, can be implemented only by the action of state agencies, the notice requirement of § 2020(e)(10) is fully implicated in the mass change context.

The unambiguous purpose of the fair hearing and benefit continuation requirements of § 2020(e)(10) is to prevent erroneous reductions in benefits until a claim of error can be resolved. General changes in the law, no less than individual exercises of caseworker discretion, are likely to result in error when implemented, as the facts of these cases indicate and the Court acknowledges. *Ante*, at 127 ("[E]rrors . . . can occur in the administration of any large welfare program"). Timely and adequate notice permits the affected recipient to surmise whether an error has been made; if the recipient invokes the statutory right to a fair hearing, the agency then determines whether the recipient is correct. That reductions are implemented massively rather than on a case-by-case basis alters not at all this sensible administrative

scheme, operating as intended under § 2020(e)(10). By reading the statute not to require any notice at all when reductions or terminations of benefits are the result of agency implementation of a "general change in the law," the Court finds an exception not indicated by the statute, its legislative history, or relevant regulations, and not supported by any logical view of the food stamp administrative process. Federal administrators have required state agencies to give some form of notice of mass changes since before § 2020(e)(10)'s enactment until today. The Court's contrary suggestion, offered in cases where the discussion is unnecessary to the result, will disrupt an administrative scheme that appears to work smoothly without the Court's help.

## III

Because food stamp benefits are a matter of statutory entitlement, recipients may claim a property interest only in the level of benefits to which they are entitled under the law, as calculated under whatever statutory formula is provided. Congress may reduce the entitlement level or alter the formula through the normal legislative process, and that process pretermits any claim that Congress' action constitutes unconstitutional deprivation of property. See *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 432–433 (1982).

Arguing from similar premises, the Court concludes that the food stamp recipients in these cases had no special right to "advance notice of the legislative change" in the earned-income deduction in 1981. *Ante,* at 130. The recipients, however, have never contended that they had a right to "advance notice" of the enactment of congressional legislation,[20] and I do not intend to argue for that proposition here. "It is

---

[20] See, *e. g.*, Brief for Respondents Parker et al. 47, and n. 26 ("This is not a case in which the plaintiffs have challenged the authority of Congress to decrease the amount of [food stamp benefits]." "[T]he plaintiffs seek only to have the admittedly valid change in the program applied correctly to their individual cases"); see also Reply Brief for Respondents Parker et al. 9; Record, Amended Supplemental Complaint ¶ 1 (Jan. 6, 1982).

plain that sheer impracticality makes it implausible to expect the State *itself* to apprise its citizenry of the enactment of a statute of general applicability." *Texaco, Inc.* v. *Short, supra,* at 550 (BRENNAN, J., dissenting) (emphasis in original).

Instead, these cases involve the *implementation* of Congress' decision by its agents, the various state agencies that administer food stamp programs across the country. Owing to factors unique to the state agency and having nothing to do with Congress, implementation of the change in Massachusetts resulted in the *erroneous* reduction of food stamp benefits for a number of households. *Ante,* at 127; see *infra,* at 151, and n. 27. Because recipients have a constitutionally cognizable property interest in their proper statutory entitlement levels, it is deprivation of those interests by the state agency, and not the passage of legislation by Congress, that requires our constitutional attention in this case.[21]

---

[21] Unlike the statute analyzed in *Texaco, Inc.* v. *Short,* 454 U. S. 516 (1982), the 1981 earned-income deduction change was not "self-executing," and as *Texaco* held, it is "essential" to distinguish "self-executing feature[s] of [a] statute" from actions taken subsequently to implement the legislative command. *Id.,* at 533. *Texaco* examined a challenge to a state law providing that mineral interests unused for 20 years *automatically* would revert to the surface owner unless a "statement of claim" was filed. *Id.,* at 518. Appellants claimed this law would effect an unconstitutional taking of their interests without due process unless they were notified when "their 20-year period of nonuse was about to expire." *Id.,* at 533. While upholding the statute, the Court repeatedly emphasized its "self-executing" character, and carefully noted that the Constitution would govern any action taken later to terminate finally appellants' property interests: "It is undisputed that, before judgment could be entered in a quiet title action that would determine conclusively that a mineral interest has reverted, . . . the *full procedural protections of the Due Process Clause . . . including notice . . . must be provided." Id.,* at 534 (emphasis supplied); see also *id.,* at 535 ("The reasoning in *Mullane* is applicable to a judicial proceeding brought to determine whether a lapse of a mineral estate did or did not occur, but not to the self-executing feature of" the law); *id.,* at 537 (distinguishing precedents on the ground that "the prop-

By focusing primarily on the "red herring" notice-of-legislative-change issue, the Court avoids explicit application of the multifactored interest-balancing test normally applied in our due process precedents. I understand the Court to make two basic arguments, however, in dismissing the recipients' constitutional claim to individualized notice of the Department's action. The first is to suggest that no notice at all is required when "inadvertent errors" are involved; such errors simply may be "put . . . to one side." *Ante*, at 127, 128. The second is that the form notice employed here sufficed to "adequately protect" the recipients' interests in any case, because recipients can be presumed to know the law regarding the earned-income deduction change and the notice told them how to appeal. *Ante*, at 130–131.

My consideration of these arguments is informed by two unchallenged facts. First, although not mentioned by the Court, when the Department sent its form notice and implemented the earned-income deduction change in December 1981, its officials knew that a substantial data entry backlog in its computerized record system meant that its food stamp files contained inaccurate earned-income information for a number of recipients. App. 85–89 (testimony of the Department's Systems Director); *id.*, at 214 (testimony of the Deputy Director of the Department's computerized file system); see also 722 F. 2d, at 938–939; Pet. App. 77–80. Thus the Department knew full well that when it took action to implement the legislative change, the food stamp benefits of a number of recipients were likely to be erroneously reduced or terminated. While the absence of such clear foreknowledge

erty interest was taken only after a specific determination that the deprivation was proper"). *Texaco* thus plainly acknowledged that due process protections were required to prevent *erroneous applications* of the statute. As I also noted in *Texaco*, if "[t]he State may . . . feasibly provide notice when it asserts an interest directly adverse to particular persons, [it] may in that circumstance be constitutionally compelled to do so." *Id.*, at 550 (BRENNAN, J., dissenting).

might not make a constitutional difference, its presence here surely sharpens the constitutional analysis.

Second, the officials in charge of the Department's computer systems testified without contradiction that it was "not a problem" to generate a notice containing the individualized information ordered by the District Court, since that information was already contained in the computers, and that the necessary programming might have taken "a few hours." App. 224; see *id.*, at 80–84, 217–227. Thus the District Court's finding, unquestioned by the Court today, was that it was likely that individualized notices could have been provided in December 1981 "without causing any delay" or any "real hardship" to the Department. Pet. App. 74–75, 94.

### A

In my view, the Court's offhand discussion of "inadvertent errors" is fogged by an unspoken conceptual confusion in identifying the constitutional deprivation claimed in these cases. In traditional cases arising under the Due Process Clause, a governmental deprivation of property is not difficult to identify: an individual possesses a set amount of property and the government's action either does, or does not, deprive the individual of some or all of it. Where "new" property interests—that is, statutory entitlements—are involved, however, claimants have an interest only in their benefit level as correctly determined under the law, rather than in any particular preordained amount. Thus, while *any* deprivation of tangible property by the State implicates the Due Process Clause, only an *erroneous* governmental reduction of benefits, one resulting in less than the statutorily specified amount, effects a deprivation subject to constitutional constraint. It is the error, and not the reduction *per se*, that is the deprivation.

Keeping this point in mind, it is readily apparent that this Court's application of the Due Process Clause to governmental administrative action has not only encompassed, but

indeed has been premised upon, the need for protection of individual property interests against "inadvertent" errors of the State. *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), and *Memphis Light, Gas & Water Division* v. *Craft*, 436 U. S. 1 (1978), to name but a few examples, all involved administrative decisionmaking presumed to operate in good faith yet subject to normal and foreseeable, albeit unintentional, error.[22] Properly applied, regulations that govern administrative decisions

---

[22] Although the Court does not define "inadvertent errors," its opinion and the facts of these cases indicate that the phrase describes errors made in good faith or unintentionally, rather than errors that could not possibly have been expected. Thus the Court acknowledges that such errors are well known to "occur in the administration of any large welfare program." *Ante*, at 127; see also *Memphis Light, Gas & Water Division* v. *Craft*, 436 U. S., at 18 ("[T]he risk of erroneous deprivation, given the necessary reliance on computers, is not insubstantial") (footnote omitted). Indeed, the testimony indicating that the Department knew that the stale data in its computer system would be used to determine new benefit levels suggests that the Court's characterization of the resulting errors as "inadvertent" is a charitable one.

In a footnote, the Court states that "[b]y hypothesis, an inadvertent error is one that the Department did not anticipate; for that reason, the Department could not give notice of a reduction that was simply the consequence of an unintended mistake." *Ante*, at 128, n. 30. In light of the Department's testimony and the Court's recognition that administrative errors are well known to occur in welfare programs, I can surmise only that the Court means that the Department did not anticipate which particular individuals would be erroneously affected, for the foreseeability of error against some portion of the class is clear and undisputed. See Brief for State Petitioner 60–61. The Court's further assertion that the Department "could not give notice of a reduction that was simply the consequence of an unintended mistake," is simply misguided. The reductions *per se* were the consequence of *Congress'* action, not the Department's, and they were certainly intended. The amount of the reductions was easily calculated, and notice could have been given. Only the Department's miscalculations were in any sense "unintended mistakes." While notice that a particular error would be made was, perhaps, impossible, notice of the reduction was both possible and required, for the very reason that only the recipients could identify particular errors before they took effect.

in such cases cannot deprive recipients of property, because a welfare or utility service recipient whose entitlement *should* be reduced or terminated under relevant statutes can claim no valid interest in continuation. Administrative decisions that affect statutory entitlements may often be correct. But when administrative error—that is, the deprivation—is foreseeable as a general matter and certain to occur in particular cases, constitutional procedures are interposed to ensure correctness insofar as feasible.[23]

"[A] primary function of legal process is to minimize the risk of erroneous decisions," *Mackey* v. *Montrym*, 443 U. S. 1, 13 (1979). Consequently, a foreseeable action that may cause deprivation of property must be *"preceded* by notice." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950) (emphasis added).[24] As we made clear in *Goldberg*, 397 U. S., at 267, in statutory entitlement cases the Due Process Clause normally requires "timely and adequate notice detailing the reasons" for proposed adverse administrative action. Such process is constitutionally required whenever the action may be "challenged . . . as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Id.*, at 268.

---

[23] One need not indisputably prove error before constitutional protections may be invoked; only a foreseeable probability of error need be shown. See, *e. g.*, *Board of Regents* v. *Roth*, 408 U. S. 564, 577 (1972) (requiring a "legitimate *claim* of entitlement") (emphasis added); *Fuentes* v. *Shevin*, 407 U. S. 67, 86 (1972) ("Fourteenth Amendment's protection of 'property' . . . has never been interpreted to safeguard only the rights of *undisputed* ownership") (emphasis added).

[24] See also *Roller* v. *Holly*, 176 U. S. 398, 409 (1900) ("That a man is entitled to some notice before he can be deprived of his liberty or property, is an axiom of law to which no citation of authority would give additional weight"); *Baldwin* v. *Hale*, 1 Wall. 223, 233 (1864) ("Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified").

Thus, in my view, it is a novel and ill-considered suggestion to "put . . . to one side" unintended but foreseeable administrative errors that concededly had adverse effects on valid property interests. Such errors are at the *heart* of due process analysis. If the Constitution provides no protection against the visiting of such errors on statutory entitlement claimants, then the development of this Court's "new property" jurisprudence over the past 15 years represents a somewhat hollow victory. The fact that errors inevitably , occur in the administration of any bureaucracy requires the conclusion that when the State administers a property entitlement program, it has a constitutional obligation to provide *some* type of notice to recipients before it implements adverse changes in the entitlement level, for the very reason that "inadvertent" erroneous reductions or terminations of benefits—that is, deprivations of property—are otherwise effected without any due process of law.[25]

---

[25] The Secretary argues that such errors "would likely be detected" after they occurred, "with corrective payments to all." Brief for Federal Respondent 25–26. Since the Department contends that the particular errors committed were unknown to it, however, it is not clear how they would be detected absent specific notice to the recipients. See *Vargas* v. *Trainor*, 508 F. 2d 485, 490 (CA7 1974), cert. denied, 420 U. S. 1008 (1975). Because the Department notably does not contend that every error that occurred in this case has in fact been detected, the Court of Appeals' order directing the Department "to check its files to ensure that [it] properly calculated the benefit reduction of each recipient," 722 F. 2d at 941, a remedy suggested by the Department itself, *ibid.*, was appropriate.

More importantly, however, the likelihood of postdeprivation correction is largely irrelevant to the constitutional inquiry regarding *notice*. Cf. *Mathews* v. *Eldridge*, 424 U. S. 319, 340 (1976) (postdeprivation process relevant to whether predeprivation evidentiary hearing is required); but see *Cleveland Board of Education* v. *Loudermill*, 470 U. S. 532, 542 (1985) ("some form of pretermination hearing" is generally required). To paraphrase *Memphis Light, Gas & Water Division* v. *Craft*, 436 U. S., at 20, "[a]lthough [food stamp benefits] may be restored ultimately, the cessation of essential [benefits] for any appreciable time works uniquely final deprivation," and adequate notice therefore must precede the adverse action.

## B

Because the errors in these cases cannot merely be ignored, I turn to the central constitutional inquiry: what process was due in light of "the practicalities and peculiarities of the case"? *Mullane* v. *Central Hanover Bank & Trust Co., supra,* at 314. Experience demonstrates that balanced consideration of a number of factors is required: the importance of the private interest affected, the risk of erroneous deprivation under the system challenged, the protective value of the different procedures proposed, and the government's interests, including any "fiscal and administrative burdens" created by different procedures. *Logan* v. *Zimmerman Brush Co.,* 455 U. S., at 434; *Mathews* v. *Eldridge,* 424 U. S., at 334–335. These interests are relevant to determining the "content of the notice" as well as its timing and other procedural claims. *Goss* v. *Lopez,* 419 U. S. 565, 579 (1975). Although the interests normally relevant to the constitutional due process inquiry are often characterized as "competing," *e. g., Cleveland Board of Education* v. *Loudermill,* 470 U. S. 532, 542 (1985), the record makes clear that the Department failed to demonstrate any countervailing interest in not providing individualized notices in this case.

1. *Importance of the Interest.* The importance of the correct level of food stamp benefits to eligible households cannot be overstated. Designed "[t]o alleviate . . . hunger and malnutrition" and allow poverty level families "to purchase a nutritionally adequate diet," Pub. L. 91–671, § 2, 84 Stat. 2048, the food stamp program by definition provides benefits only to those persons who are unable to afford even a minimally adequate diet on their own. An erroneous reduction or break in benefits, therefore, may literally deprive a recipient "of the very means by which to live." *Goldberg, supra,* at 264.[26]

---

[26] Census statistics indicate that the median annual income of all households receiving food stamps was less than $6,000 in 1982. Bureau of the

2. *Risk of Error.* Both courts below found that the likelihood of error by the Department in implementing the earned-income deduction change was substantial. 722 F. 2d, at 939; Pet. App. 88–95. The Court does not challenge that evaluation, and it is amply supported by the record. The existence of implementation errors was unchallenged at trial.[27] Because of a severe data entry backlog in the Department's computers during the fall of 1981, an undetermined number of food stamp recipients' files contained erroneous earned-income figures.[28] Thus, although the mathematical operation necessary to implement the statutory change was theoretically simple, its actual performance in Massachusetts necessarily carried with it a high risk of error.

The Department did not challenge the recipients' proof regarding the risk of error at trial, but instead argued as it

---

Census, Characteristics of Households and Persons Receiving Selected Noncash Benefits: 1982, p. 19 (1984). "The 1984 poverty threshold is $8,280 for a family of three and $10,610 for a family of four." House Committee on Ways and Means, Children in Poverty, 99th Cong., 1st Sess., 196 (Comm. Print 1985). See also *Mathews* v. *Eldridge, supra,* at 340 ("[W]elfare assistance is given to persons on the very margin of subsistence").

[27] For example, a random sample of less than one-third of the 16,000 households that received the Department's December 1981 notice showed that 585 households listed as having *no* earned income nevertheless received the notice. Of these, 211 households experienced a change in their benefit level, although by statutory definition no change should have occurred. Pet. App. 81–82. Thus the Court's statement that Congress' "amendment had no effect on households with no income," *ante,* at 118, is simply wrong with regard to implementation of the law in Massachusetts.

[28] Data for over 9,000 of the households that received the notice at issue in these cases were contained in the affected computer system. Pet. App. 78. Over two-thirds of the data entries scheduled for this system had not been processed during the relevant period, and the District Court concluded that "it was more likely than not" that the correct earned-income information "for any of the [affected] households . . . was not entered . . . prior to implementation of the change in the earned income disregard." *Id.,* at 79.

does here that any such risk was caused not by the statutory change but by its ministerial implementation based on pre-existing data in the files. As indicated above, however, it is precisely that implementation, and not the statutory change, that the recipients have challenged throughout. The fore-seeable risk of the Department's errors stands unrefuted.

3. *Value of Additional Procedures.* Adequate notice under the Due Process Clause has two components. It must inform affected parties of the action about to be taken against them as well as of procedures available for challenging that action. *Memphis Light,* 436 U. S., at 13; *Mullane,* 339 U. S., at 314. These requirements serve discrete purposes: adequate notice of the action itself permits the individual to evaluate its accuracy or propriety and to determine whether or not to contest it; notice of how to appeal ensures that available error-correction procedures will be effective. In *Memphis Light, supra,* the second component was examined, and I have no doubt that the Court today correctly con-cludes that recipients of the mass change notice here were adequately informed of the "procedure for protesting." 436 U. S., at 15; see *ante,* at 128.

These cases are the converse of *Memphis Light,* however, and the subtle yet vital failure of the notice here is that it completely failed to inform recipients of the particular action proposed to be taken against them *by the Department.*[29] The

---

[29] The Court finds that the form notice here was adequate simply because it explained how to appeal and, if a recipient contacted the Department, their benefits were not reduced until a hearing was held. *Ante,* at 128. This rationale ignores the first component of notice that our cases rec-ognize: notice of the proposed action. This notice told recipients only of Congress' change, and did not even identify the Department's action ("reduced *or* terminated," App. 5), let alone provide sufficient information to evaluate it. See n. 4, *supra.* By approving a form of notice that en-courages recipients to appeal whether they have a reason or not, the Court likely adds to the costs of welfare administration. Moreover, as noted above, n. 6, no regulation required the Department to continue a recipi-

notice included only a single vague statement about some impending impact on food stamp benefits: due to *Congress'* action, recipient's benefits would "either be reduced . . . or . . . terminated." App. 5. The defendant in this lawsuit, however, is the Massachusetts Department of Public Welfare, not Congress, and the action of which notice was required was, it bears repeating, *not* Congress' decision to change the law but rather the Department's application of that changed law to individual recipients.[30] "Central to the evaluation of any administrative process is the nature of the relevant inquiry." *Mathews,* 424 U. S., at 343. In these cases the administrative inquiry was uncomplicated: what was the current earned income of each recipient, and what should his reduced food stamp benefit be after Congress' change was applied to that figure? The obvious value of notice of those simple factual determinations[31] is that they

---

ent's benefits absent some claim of factual error. Unless the Court intends to impose such a requirement under the Constitution by its decision today, its ground for decision fails to support its constitutional conclusion.

[30] The Secretary was a party in the District Court only on the theory that the mass change regulation was unconstitutional. The District Court did not so hold, however, and its order ran solely against the state agency. The Department's authorities wrote and designed the particular form notice at issue, and only the errors caused by the Department's actions were the subject of challenge. In evaluating the adequacy of the notices, therefore, the value of additional information in preventing the Department's errors is the appropriate focus of analysis.

[31] It is conceded that implementation of the 1981 law required the Department to make these determinations in each individual case. See, *e. g.,* Brief for State Petitioner 65 (implementation "required a computer recalculation of each household's benefits"). I thus fail to understand the Court's suggestion that "[t]his, of course, would be a different case if the reductions were based on . . . individual factual determinations." *Ante,* at 131, n. 35. The Court might intend to distinguish actions requiring simple mathematical determinations from application of laws requiring greater judgment or discretion on the part of administrators. But we have never before suggested that such a distinction might make a difference, nor does

were the *only* data that would have enabled each recipient to "choose for himself whether to . . . acquiesce or contest," *Mullane, supra,* at 314, by filing a benefit-preserving appeal.[32]

The Court ultimately brushes aside any value that individualized notice may have had, stating that "citizens are presumptively charged with knowledge of the law," and asserting that "[s]urely Congress can presume that [a form] notice relative to a matter as important as a change in a food-stamp allotment would prompt an appropriate inquiry if not fully understood." *Ante,* at 130, 131. This reasoning is wholly unpersuasive. First, I am unwilling to agree that "[t]he entire structure of our democratic government," *ante,* at 131, rests on a presumption that food stamp recipients know and comprehend the arcane intricacies of an entitlement program that requires over 350 pages in the Code of Federal Regulations to explain and voluminous state manuals to administer. I am more certain that the premises of our polity include minimal protections for the property interests of the poor.

Moreover, in *Memphis Light,* the Court flatly rejected the argument that the poor can protect themselves without

the Court provide any analytical justification for such a conclusion today. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), clearly stated that the procedural protections of the Due Process Clause apply whenever the potential for erroneous decision based on "incorrect or misleading factual premises or . . . misapplication of rules or policies to the facts of particular cases" exists. *Id.,* at 268. See also *Yee-Litt* v. *Richardson,* 353 F. Supp. 996 (ND Cal. 1973).

[32] The Secretary reports that households normally receive their first reduced benefit allotment "a few weeks after the notice." Brief for Federal Respondent 37. The form notice here, however, provided that recipients had a right to continued benefits pending a fair hearing only if their request were *received* within 10 days from the date of the notice. App. 5; see 7 CFR §§ 273.15(k)(1), 273.13(a)(1) (1981). Otherwise, a recipient had only a right to reimbursement for erroneously reduced benefits "as soon as administratively feasible" after prevailing in a fair hearing. 7 CFR § 273.15(r)(2) (1981).

process. The dissent there argued that "a homeowner surely need not be told how to complain about an error in a utility bill." 436 U. S., at 26 (STEVENS, J., dissenting). The Court ruled, however, that "skeletal notice" was constitutionally insufficient because utility customers are "of various levels of education, experience and resources," and "the uninterrupted continuity of [utility service] is essential to health and safety." *Id.*, at 14–15, n. 15. See also *Mathews* v. *Eldridge, supra*, at 349 ("[P]rocedures [must be] tailored . . . to 'the capacities and circumstances of those who are to be heard'") (citation omitted). In this case, over 45% of affected food stamp recipients in Massachusetts had not completed high school. App. 127. In such circumstances recipients must be "informed clearly." *Memphis Light,* 436 U. S., at 14–15, n. 15.

Additionally, this record reveals that the Court's reliance on the protective value of an "appropriate inquiry" is misplaced. The notice here did indeed state that recipients should call their local welfare office if they had "questions concerning the correctness of [their] benefits computation." App. 5. Putting aside the fact that the notice did not *inform* any recipient of his "benefits computation," the testimony of the representative named plaintiffs at trial was uniformly that the local welfare workers they called about the notice were either unaware of it or could not explain it. *Id.*, at 131 (Zades), 139 (Parker), 149 (Johnson). With no help forthcoming at the local level, the 10-day appeal period was virtually certain to expire before even those recipients who called would receive a specific explanation enabling them intelligently to decide whether or not to appeal.

Finally, the *Mathews* inquiry simply does not countenance rejection of procedural alternatives because a court finds existing procedures "adequate" in some ad hoc sense, without evaluation of whether additional procedures might have been more protective at little or no cost to the government. Yet the Court discusses neither the protective value of individ-

ualized notice in this context nor the burden, if any, that it would impose on the Department.

4. *Governmental Interests.* The District Court concluded that only four simple facts were necessary to transform this vague notice into one that adequately informed affected individuals about the Department's action in their particular cases: "whether [their benefits] were being reduced or terminated" and "the individual recipient's old food stamp benefit amount, new benefit amount, [and] the amount of earned income that was being used to compute the change." Pet. App. 100. These data were already contained in the Department's computerized files, and the computers could have been programmed to print the individualized information on the form notices with little additional time or effort.[33] The District Court's finding, not questioned by the Court today, was that programming the computer to provide such individual information is "neither a difficult nor burdensome procedure," *id.*, at 75–76, and that had the Department requested that such individualized data be printed on the December 1981 notices, it was likely that it could have been accomplished "without causing any delay . . . ." *Id.*, at 74, 75. This record, therefore, can support no argument that individualized notice would have been a burden for the Department.[34]

---

[33] App. 80–84, 217–227. Indeed, prior to trial below the same computer system generated a list of recipients containing precisely the information found necessary by the District Court. Pet. App. 80. In light of this evidence, it is unsurprising that, as the District Court stated, "the Commonwealth [did] not argue the conservation of scarce fiscal resources." *Id.*, at 92–93. See also *Philadelphia Welfare Rights Organization* v. *O'Bannon,* 525 F. Supp. 1055, 1060 (ED Pa. 1981) (administrative burden in providing individualized notice of state implementation of the 1981 earned-income deduction change was "negligible").

[34] The District Court also found that individualized notice would "operat[e] to benefit the agency because such a notice should reduce the amount of client visits and phone calls to the agency seeking clarification, reduce

## IV

The Court's regulatory conclusion is unconvincing, and its statutory dictum is unfortunate. But I am most troubled by the Court's casual suggestion that foreseeable "inadvertent" errors in the administration of entitlement programs may be ignored in determining what protection the Constitution provides. Such administrative error all too often plagues governmental programs designed to aid the poor.[35] If well-meaning mistakes that might be prevented inexpensively lie entirely outside the compass of the Due Process Clause, then the convenience of the administrative state comes at the expense of those least able to confront the bureaucracy. I respectfully dissent.

JUSTICE MARSHALL, dissenting.

I share JUSTICE BRENNAN's view that the logic of the relevant regulation, 7 CFR § 273.12(e)(2)(ii) (1985), requires the sort of notice that the lower courts ordered here. The regulation contemplates a notice that allows families to "adjust household budgets" according to changes in benefit levels,

---

the amount of unnecessary appeals, and free up the time of the caseworkers for other tasks." Pet. App. 76–77; see App. 95–96 (expert testimony that vague mass change notice throws agency into "administrative chaos"). This finding is due deference in this Court. Although the Court properly rejects such evidence in its discussion of the regulations and statute, *ante*, at 127, n. 29, our constitutional precedents require that the "fiscal and administrative burdens" of process enter the analysis once it is determined that notice of some kind is required under the Due Process Clause. *Mathews*, 424 U. S., at 335; see *Mullane*, 339 U. S., at 317 (considering "practical difficulties and costs" of types of notice).

[35] See, *e. g.*, Hearing on Children, Youth, and Families in the Northeast before the House Select Committee on Children, Youth and Families, 98th Cong., 1st Sess., 51, 53 (1983); Hearings on HEW Efforts to Reduce Errors in Welfare Programs (AFDC and SSI) before the Subcommittee on Oversight of the House Committee on Ways and Means, 94th Cong., 2d Sess. (1976).

43 Fed. Reg. 18896 (1978), and I fail to see how a notice that does not inform recipients of their new benefit levels can serve this purpose. Given that this interpretation of the regulation disposes of the cases, I find no need to reach the other issues addressed by the Court or by the dissent. I therefore join Part I of JUSTICE BRENNAN's dissent.