Roxanne **CAPLES, Sandra White, individually and on behalf of all others similarly situated, and Laura Cook, parent and natural guardian for her** minor children, **Michael Layne, Oliver Vaughan, Jason Layne, Elliott Cook, Jr., and Felicia Cook, Plaintiffs,**

v.

Clayton **YEUTTER, Secretary of the United States Department of Agriculture, and Sandra Gardebring, Commissioner of the Minnesota Department of Human Services, Defendants.**

Civ. No. 4–89–196.

United States District Court, D. Minnesota, Fourth Division.

Sept. 25, 1989.

Mark Bohnhorst, Martha Eaves, Southern Minnesota Regional Legal Services, St. Paul, Minn. Charles Thomas, Mankato, Minn., for plaintiffs.

Hubert H. Humphrey, III, Minnesota Atty. Gen., and Patricia Sonnenberg, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendant Gardebring.

Jerome G. Arnold, U.S. Atty., and Kenneth W. Saffold, Asst. U.S. Atty., Minneapolis, Minn. (John Daugherty, of counsel, U.S. Dept. of Agriculture, Washington, D.C.), for defendant Yeutter.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

The issue before the Court is whether the decision by the Secretary of Agriculture to treat payments made to secured crisis shelters under Minn.Stat. § 256D.05, subd. 3, as income to the beneficiaries for the purpose of determining food stamp eligibility violates the Food Stamp Act and its implementing regulations. The plaintiff class and defendant Clayton Yeutter, United States Secretary of Agriculture, have filed cross-motions for summary judgment. Defendant Sandra Gardebring, Commissioner of the Minnesota Department of Human Services, agrees with the arguments advanced by plaintiff and does not object to the relief plaintiffs request. After carefully considering the arguments of the parties, the Court has decided to grant summary judgment in favor of the plaintiffs.

## I. FACTS

Minnesota's General Assistance (GA) and Aid to Families with Dependent Children (AFDC) programs help individuals and families in poverty meet basic subsistence needs. Both programs operate on the "flat grant" approach, that is the programs provide a standard payment for all households of similar size and composition.[1] Affidavit of Barbara Anderson at par. 4, 8. The amount of the payments are intended to provide 100 percent of the need for a typical household in each category. Anderson Aff. at par. 7 and Attachments A, B.

In 1977, Minnesota amended its GA program in order to provide shelter facilities for battered women and their children. Under Minn.Stat. § 256D.05, subd. 3, the costs of shelter services are paid for women and the children of women "who are being or have been assaulted by their spouses, other male relatives, or other males with whom they are residing or have resided in the past," provided that the woman meets the income and resource eligibility limits for GA or AFDC. Minn.Stat. § 256D.05, subd. 3. The GA program pays the costs of shelter services directly to the shelter facility. *Id.* It is the shelter facility, rather than the beneficiary, which has a right to appeal a decision denying payment for shelter service under the statute. Minn.Stat. 256D.05, subd. 3a. The payments are not coordinated with, nor do they replace, the public assistance grant that the battered woman and her children might receive.[2]

Sixteen different secured crisis shelters located in various communities throughout Minnesota receive funding through the GA program. Affidavit of Barbara Raye[3] at

---

**1.** The alternative to the flat grant approach would be to structure payments according to the specific need of the beneficiary. Prior to October 1, 1973, Minnesota's public assistance grants were based on an itemized need standard. Anderson Aff. at par. 5. Under that system, each beneficiary's need was calculated for several itemized categories. *See Hoehle v. Likins,* 405 F.Supp. 1167, 1168 (D.Minn.1975), *aff'd in part,* 538 F.2d 229 (8th Cir.1976). The amount of the grant was the difference between the beneficiary's available income and his individual calculated need. *Id.* The itemized need standard has since been rejected because it often resulted in overpayments or underpayments and because

it was expensive to administer. Anderson Aff. at par. 6.

**2.** Minn.Stat. 256D.05, subd. 3 provides:

Payments to shelter facilities shall not affect the eligibility of individuals who reside in shelter facilities for aid to families with dependent children or general assistance or payments made to individuals who reside in shelter facilities through aid to families with dependent children or general assistance, except when required by federal law or regulation.

**3.** Raye is Director of Victim Services for the Minnesota Department of Corrections.

par. 4. Most of these are homes converted for use as secured crisis shelters. *Id.* The capacity of the secured crisis shelters ranges from eight to thirty persons. *Id.*

During the past year, secured crisis shelters received 16,331 requests for service from women in situations of domestic abuse. *Id.* at par. 6. Fifty-four percent, or 8,821, of these requests had to be turned down for lack of space. *Id.* Because the demand for placement in secured crisis shelters is so much greater than the space available, secured crisis shelters only house those women and children in emergency circumstances. *Id.* The most important factor in determining access to the secured crisis shelters is the immediate danger or threat of serious physical harm to the woman and her children. *Id.* at par. 5. The average length of stay in the secured crisis shelters is thirteen days. *Id.* at par. 6.

Shelter service is also provided through "safe homes," which are private homes available for battered women and their children to stay for brief periods. *Id.* at par. 7. Safe homes are frequently used when women or families are unable to obtain immediate access to one of the sixteen secured crisis shelters. *Id.* Most safe homes limit the maximum length of a stay to three days. *Id.* The average length of a stay in a safe home is two days. *Id.* Like secured crisis shelters, safe homes are eligible to receive GA per diem vendor payments under Minn.Stat. 256D.05, subd. 3. *See* Raye Aff. at par. 8.

Secured crisis shelters are funded primarily through the Department of Corrections' Battered Women's Program and GA per diem vendor payments. Secured crisis shelters may also raise funds from other sources such as their local municipality or the United Way. *Id.* at par. 10. Apparently, there is little uniformity in the budgets of the shelters. The size and funding of the shelters varies and, just as importantly, the manner in which the shelters are managed differs. In some shelters, a strong value is placed on having all residents share in the chores; in others, it is felt that persons in situations of crisis should be relieved of any unnecessary duties. *Id.* at 10. Thus, some shelters have their cleaning and yard work done on a volunteer basis by the residents, others contract to have that work done. *Id.* Some shelters expect some contribution or payment for food from residents, while other shelters pay for food out of their state funding. *Id.* at par. 11. In most shelters there are multiple sources of funding for food. *Id.*

The Department of Corrections, which reviews and monitors shelter budgets, has decided "to honor and respect local values and local norms so long as they fit within certain broad limits." *Id.* at par. 10. The shelters budget their expenses as either "maintenance" or "security" costs; however, there are no set rules for defining which expenses shall be allocated to "security" and which to "maintenance." *Id.* at par. 11. For example, some shelters budget food as a "security" cost, others budget it as a "maintenance" cost. *Id.* Although the Department of Corrections states that it intends to develop a more sophisticated means of monitoring program budgets, neither now nor any time in the foreseeable future is there any method for determining what portion of the GA per diem payment is allocated to the daily living expenses of the residents. *Id.* at par. 12. The greatest part of the per diem payment, however, pays for the personnel and administrative costs of providing 24–hour security. *Id.* at par. 12; Affidavit of Trish Townsdin at par. 5. One shelter which provides meals to its residents has calculated that only four percent of the per diem cost is allocated to food. Townsdin Aff. at par. 5.

Although safe homes are eligible to receive GA per diem vendor payments, many of them do not apply for the payments. Raye Aff. at par. 8. No information has been provided to the Court concerning how much of a vendor payment to a safe home is allocated to the resident's living expenses. *See id.*

## II. FEDERAL STATUTORY AND REGULATORY FRAMEWORK

The dispute in this case concerns whether GA per diem vendor payments provided

under Minn.Stat. § 256D.05 may be treated as income to the beneficiary for food stamp purposes. The food stamp program was established in 1964 to raise "levels of nutrition among low-income households." Food Stamp Act of 1964, Pub.L. No. 88–525, § 1, codified as amended at 7 U.S.C. § 2011, *et seq.* Eligible households residing in states which participate in the food stamp program are entitled to obtain coupons redeemable for food at retail stores. 7 U.S.C. §§ 2013(c), 2014(b). The Secretary of Agriculture has promulgated income and resource eligibility standards pursuant to statute. *See* 7 C.F.R. §§ 273.8–.10. Just like other welfare benefits, food stamps are a matter of statutory entitlement for those persons qualified to receive them. *Atkins v. Parker*, 472 U.S. 115, 128, 105 S.Ct. 2520, 2528, 86 L.Ed.2d 81 (1985).

Eligibility for the food stamp program and the amount of food stamps awarded depends on the size, income and resources of the applicant household. *See Murray v. Lyng*, 854 F.2d 303, 304 (8th Cir.1988). The Food Stamp Act defines income at 7 U.S.C. § 2014(d)(1) as "all income from whatever source" with fifteen specific exclusions, including one for "any gain or benefit which is not in the form of money payable directly to a household, except as provided in subsection (k) of this section." Subsection (k) states that assistance provided to a third party on behalf of a household shall be considered money directly payable to the household (and thus income) if the assistance is provided "in lieu of" a benefit payable for living expenses under AFDC, GA or another basic assistance program comparable to GA.[4] 7 U.S.C. § 2014(k)(1). Excluded from income are vendor payments to provide medical assistance, child care assistance, energy assistance, housing

assistance payments, emergency assistance for migrant or seasonal farm worker households which are "in the job stream," or "emergency or special assistance, to the extent excluded in regulations prescribed by the Secretary." 7 U.S.C. § 2014(k)(2). Thus, under the statute, vendor payments which are paid "in lieu of" regular benefits are considered income. Vendor payments provided as emergency or special assistance are excluded from income to the extent provided in the regulations governing food stamps.

The regulations promulgated by the Secretary of Agriculture define vendor payments as "emergency or special assistance" if provided "over and above the normal PA [public assistance] or GA grant or payment, or … not normally provided as part of such grant or payment." 7 C.F.R. § 273.9(c)(1)(iv)(B). The Secretary has attempted to explain the meaning of this language through the use of the following example.

> For example, where a PA or GA program provides all households with school age children with a monthly "extra" childrens [sic] clothing allowance, paid directly to a clothing store, that allowance would not be excluded because it is part of the regular monthly assistance for all households in that category and is not really an "extra" payment. On the other hand, if a fire destroyed the household's clothing and it receives an "emergency" amount paid directly to a clothing store, such a payment could be excluded under this provision.

*Id.* The commentary on the regulations published in the Federal Register at the

---

**4.** Section 2014(k) was added to the Food Stamp Act in 1985 in response to the efforts of a few communities to prevent the Secretary of Agriculture from treating general assistance as income for food stamp purposes by providing general assistance solely through third-party vendor payments. *See Blinzinger v. Lyng*, 834 F.2d 618, 620 (7th Cir.1987). The pertinent part of the amendment reads as follows:

> [A]ssistance provided to a third party on behalf of the household by a state or local government shall be considered money pay-

able directly to the household if the assistance is provided in lieu of—
> (A) a regular benefit payable to the household for living expenses under [AFDC]; or
> (B) a benefit payable to the household for living expenses under—
> (i) a State or local general assistance program; or
> (ii) another basic assistance program comparable to general assistance (as determined by the Secretary).

7 U.S.C. § 2014(k)(1).

time of their promulgation is also instructive.

There has been some confusion as to what is considered to be "part of a normal PA grant and over and above the normal PA grant." ... By way of explanation, most PA and GA grants are composed of various needs-based components or standards for such expenses as, but not limited to, shelter, transportation, food and clothing for categories of persons in need of or eligible for such aid. A maximum payment amount and/or rate of payment is established for each component. *To the extent that State or local assistance is not included as a regular component of a PA or GA grant or benefit or to the extent that the amount exceeds the maximum rate of payment established for the relevant component, the assistance would be considered over and above the normal grant and not part of the grant.*

52 Fed.Reg. 36393–94 (emphasis added).

The regulations also require a state agency to apply to the Department of Agriculture's Food and Nutrition Service for an exclusion determination any time it is not clear whether a certain PA or GA vendor payment may be excluded from income as emergency or special assistance. 7 C.F.R. § 273.9(c)(1)(iv)(B).

## III. PROCEDURAL HISTORY

On August 1, 1988, the Secretary put into effect a policy of treating GA vendor payments made under Minn.Stat. § 256D.05, subd. 3, as income for food stamp purposes. Plaintiffs subsequently filed a class action complaint seeking injunctive and declaratory relief on the grounds that the Secretary's policy was contrary to the provisions of the Food Stamp Act and its implementing regulations. Plaintiffs subsequently filed motions for class certification and for a temporary restraining order. Both motions were granted. The Court has certified a class consisting of "all persons whose food stamp benefits have been or will be affected by treating vendor payments made to a battered women's shelter facility pursuant

to Minn.Stat. § 256D.05, subd. 3, as income for the purpose of determining eligibility for food stamps." Order of March 22, 1989 at 2. The Court ordered defendant Sandra Gardebring, Commissioner of the Minnesota Department of Human Services, to instruct all county agencies which administer the food stamp program within Minnesota not to consider vendor payments made pursuant to Minn.Stat. § 256D.05, subd. 3, as income for the purpose of determining eligibility for food stamps. *Id.* The instruction was to take effect on April 1, 1989. *Id.*

The order of March 22, 1989 also ordered defendant Gardebring to file an application pursuant to 7 C.F.R. § 273.9(c)(1)(iv)(B) with the appropriate office of the Food and Nutrition Service for a determination of whether vendor payments made pursuant to Minn.Stat. § 256D.05, subd. 3, should be excluded from income under 7 U.S.C. § 2014(k)(2)(F) as emergency or special assistance benefits. *Id.* at 3.

In the response of the Food and Nutrition Service to Minnesota's section 273.-9(c)(1)(iv)(B) application, the Secretary modified his original position. Having first taken the position that the entire vendor payment should be treated as part of income, the Secretary now acknowledged that part of the vendor payment qualified as emergency assistance and should be excluded from income.

The new position was based upon the Secretary's understanding of the provisions in the Minnesota GA program for paying shelter costs. Affidavit of Gail Olson Exh. A, May 11, 1989 Letter from Bonny O'Neill, Acting Deputy Director of the Food Stamp Program. As understood by the Secretary, Minnesota's GA program provided eligible persons in need of temporary shelter with a cash payment and a vendor payment for the cost of shelter. *Id.* The vendor payment for the cost of temporary shelter was subject to a cap amount. *Id.* Both the cash payment and the vendor payment for shelter were treated as income for food stamp purposes. *Id.* According to the Secretary, the cap applicable to payments for temporary shelter was not appli-

cable to payments for secured crisis shelter. *Id.* The Secretary therefore took the position that vendor payments to secured crisis shelters should be included as income for food stamp purposes *up to the cap amount. Id.* The Secretary does not consider shelter costs up to the cap amount to be emergency payments because, under the Secretary's understanding of Minnesota's GA program, those payments were a component of the basic grant. *Id.* The Secretary acknowledged that the amount paid above the cap exceeded the normal GA grant and should be excluded from income. *Id.*

Minnesota's GA program does not operate as the Secretary understands it to operate, however. Minnesota's GA program pays for two principal types of shelter: emergency shelter and negotiated rate facilities. Olson Aff. Exh. B, June 2, 1989 Letter from Paul Timm–Brock, Director Assistance Payments Division, Minnesota Department of Human Services. Emergency shelter payments are made under the GA and the AFDC programs when the beneficiary faces an emergency need for shelter caused, for example, by eviction, foreclosure or natural disaster. *See* Minn. Rules §§ 9500.1238, 9500.2820. Payments for emergency shelter are not subject to a cap amount. Olson Aff. Exh. B. The payments do not affect the recipient's eligibility for GA or the size of his GA grant. *Id.* Such payments are not treated as income for food stamp purposes. *Id.*

Negotiated rate facilities are very different from temporary shelters. Negotiated rate facilities are licensed facilities which provide long-term housing to individuals suffering from mental illness, chemical dependency, developmental disabilities, or old age. *Id.* The residents of negotiated rate

facilities live in these facilities for extended periods of time. *Id.* They do not receive a regular GA grant of $203 per month, instead they receive a personal needs allowance of $47 per month. *Id.;* Minn.Rules § 9500.1218.

## IV. WHETHER THE SECRETARY MAY PROPERLY TREAT VENDOR PAYMENTS TO SECURED CRISIS SHELTERS AS INCOME FOR FOOD STAMP PURPOSES

■ An agency's construction of its own regulation is entitled to substantial deference. *Lyng v. Payne,* 476 U.S. 926, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986). The regulation as construed by the agency need not be the best or most equitable choice of policies; as long as the agency's interpretation is a valid exercise of the Secretary's authority and consistent with the language of the regulation as promulgated, it must be upheld by the courts. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2792–93, 81 L.Ed.2d 694 (1984); *Knebel v. Hein,* 429 U.S. 288, 294, 97 S.Ct. 549, 553, 50 L.Ed.2d 485 (1977). Thus, the plaintiffs in this case can prevail only if Secretary Yeutter's application of 7 C.F.R. § 273.9(c) is contrary to the statutory purposes of the Food Stamp Act or plainly inconsistent with the wording of the regulation. *See United States v. Larionoff,* 431 U.S. 864, 871–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977).

The statute at issue, 7 U.S.C. § 2014(k), evinces a desire on the part of Congress to have all basic public assistance payments, *i.e.,* grants intended to be used for living expenses, treated as income for food stamp purposes even if paid to third parties through vendor payments.[5] Vendor pay-

---

5. The legislative history illustrates this point.
   In some cases, general assistance may be provided as third-party payments only, with no payments going directly to households. Under the Committee's provision [section 2014(k)], none of these distinctions would matter, since any governmental payment made to the provider of goods or services on behalf of a household (in lieu of a payment made directly to the household) would be included as income unless specifically exclud-

ed by regulations promulgated under the authority provided to the Secretary.
   The provision will enforce Congress' historical intent that payment from governmental assistan[ce] programs be included as income regardless of their form and insure equity between groups of individuals who receive assistance in various forms.
S.Rep. No. 145, 99th Cong., 1st Sess. at 234, *reprinted in* 1985 U.S.Code Cong. & Admin. News 1103, 1676, 1900.

ments for "emergency or special assistance" are to be excluded from income to the extent provided by the Secretary in the regulations implementing the food stamp program. 7 U.S.C. § 2014(k)(2)(G).

The Secretary has provided that vendor payments "over and above the normal PA or GA grant or payment, or ... not normally provided as part of such grant or payment" are considered emergency or special assistance and excluded from income. 7 C.F.R. § 273.9(c)(1)(iv)(B). A vendor payment is "over and above" the normal GA or PA grant to the extent that it "is not included as a regular component of a PA or GA grant or benefit or to the extent that the amount exceeds the maximum rate of payment established for the relevant component." 52 Fed.Red. 36393–94.

Payments under Minn.Stat. § 256D.05, subd. 3, are not for the purpose of subsidizing the normal living expenses of battered women and children and do not constitute a regular component of general assistance. The statute specifically provides that payments to secured crisis shelters will not affect the beneficiary's eligibility for GA or AFDC or the level of her benefits under the two programs.[6] This reflects the fact that the payments are intended to respond to an emergency situation caused by domestic abuse. The women and children served by the shelters are generally in immediate danger of physical harm. Shelter, protection and counseling are provided for a short period of time in order to defuse the crisis and begin the process of ending the abuse.

The basis for the Secretary's position that a portion of payments for secured crisis shelters should be treated as income for food stamp purposes is the Secretary's incorrect belief that Minnesota provides payments for temporary shelter as a regular component of the GA grant. Relative to the two principal types of shelter paid for by Minnesota's GA program, secured crisis shelter service is clearly more like emergency shelter than placement in a negotiated rate facility. Payments for secured crisis shelters and emergency shelter are both a response to an emergency situation. In both cases the payment is "over and above" the normal GA grant in the sense that it does not affect the beneficiary's eligibility for GA or the level of the beneficiary's grant. In neither case is the payment subject to a fixed cap amount. Payments for emergency shelter are not treated as income for food stamp purposes.

The Secretary argues that payments under section 256D.05, subd. 3, are not "over and above" the normal GA grant because those payments are part of "a normal and regular system of assistance to meet basic shelter needs." Defendant Yeutter's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 9–10. Through this argument, the Secretary is attempting to characterize payments for secured crisis shelters as a regular component of the GA grant. *See,* 52 Fed.Reg. 36393–94, *quoted supra* at 9–10.

For several reasons, the Secretary's argument is unpersuasive. First, even assuming payments for secured crisis shelters are part of the "normal and regular system of assistance," then payments for emergency shelter must be considered part of that system as well. Yet, payments for emergency shelter are not treated as part of the beneficiary's income for food stamp purposes.

Second, the vendor payment for secured crisis shelters specifically does not substitute for that portion of the GA grant intended for shelter costs. As the Court has noted, section 256D.05, subd. 3, specifies that vendor payments to secured crisis shelters shall not affect the beneficiary's eligibility for GA or the level of her GA benefits. This stands to reason. A battered woman does not come to a shelter to find housing. She comes because she needs protection from imminent physical

---

6. Minn.Stat. § 256D.05, subd. 3 provides: Payments to shelter facilities shall not affect the eligibility of individuals who reside in shelter facilities for aid to families with dependent children or general assistance or payments made to individuals who reside in shelter facilities through aid to families with dependent children or general assistance, except when required by federal law or regulation.

danger and help in ending an abusive relationship. The bulk of the vendor payment pays for the cost of providing 24–hour security, not the residents' living expenses. Raye Aff. at par. 12; Townsdin Aff. at par. 5.

Third, payments for secured crisis shelters are not a part of the "normal and regular system of assistance" because these benefits are paid only to persons who confront a specific sort of emergency. It is not a benefit conferred to every household of a certain size or composition. Women and the children of women "who are being or have been assaulted by their spouses, other male relatives, or other males with whom they are residing or have resided in the past" can receive benefits under section 256D.05, subd. 3. The payments address a crisis situation and provide only short-term relief. In this regard, Minnesota's program to pay for secured crisis facilities is analogous to the example of emergency assistance described in the regulations: a vendor payment for clothing paid to every eligible household whose clothes are lost in a fire. 7 C.F.R. § 273.9(c)(1)(iv)(B).

Because the vendor payments provided under Minn.Stat. § 256D.05, subd. 3, are emergency assistance provided "over and above" the normal GA grant, the Court must conclude that it is inconsistent with the regulations governing the food stamp program to treat those payments as income. Therefore, plaintiffs' motion for summary judgment will be granted and the Secretary's motion for summary judgment will be denied.

V. RELIEF

■ In granting summary judgment, the Court holds that the defendants' policy of treating vendor payments made under Minn.Stat. § 256D.05, subd. 3, as income for food stamp purposes is a violation of the regulations implementing the Food Stamp Act. The Court will enter an injunction enjoining defendants from treating such payments as income for the purpose of determining eligibility or benefit levels under the food stamp program. The Court will also award members of the plaintiff class all food stamp benefits withheld during August 1, 1988 until April 1, 1989, the period when the challenged policy was in effect. Finally, the Court will grant plaintiffs' motion for voluntary dismissal of the claim raised in paragraph 33 of the complaint. Paragraph 33 alleges that a portion of the per diem payments were treated as unearned income prior to August 1, 1988. Plaintiffs have determined that their claim was incorrect and therefore seek to withdraw it. Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 2 n. 1.

Accordingly, based on the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that:

1. plaintiffs' motion for summary judgment is granted;

2. defendant Yeutter's motion for summary judgment is denied;

3. defendant Yeutter's policy of treating vendor payments made under Minn. Stat. § 256D.05, subd. 3, as income to the women or families on whose behalf the vendor payment is made is found to be in violation of the regulations implementing the Food Stamp Act, specifically 7 C.F.R. § 273.9(c)(1)(iv)(B);

4. defendant Yeutter, his successors in office, agents, employees, and all persons acting in concert with them in administering the food stamp program in Minnesota, including defendant Sandra Gardebring, her successors in office, agents, employees and all persons acting in concert with her, are permanently enjoined from treating as income for food stamp purposes any General Assistance vendor payment made under Minn.Stat. § 256D.05, subd. 3;

5. members of plaintiff class are awarded all food stamp benefits wrongfully withheld between August 1, 1988 and April 1, 1989 under the policy identified in paragraph 3 above;

6. the parties shall attempt to agree upon an appropriate and administratively feasible method for restoring past benefits to the plaintiff class and report the results

of their negotiations to the Court within sixty days of the date of this order; and

7. plaintiffs' claims relating to the treatment of vendor payments made under Minn.Stat. § 256D.05, subd. 3, prior to August 1, 1988 are dismissed.