PARKER, Justice
(dissenting).
Six of the nine Justices of this Court have written seven opinions in this case.[13] I find this remarkable, because neither the applicable child-custody laws nor the relevant legal precedents appear to be particularly unclear or inconsistent. This being so, we must look elsewhere for an explanation. After considerable reflection, I have concluded that the primary cause of the Court’s varied and often conflicting opinions in this case is disagreement over foundational issues that underlie the more visible custody issues. Thus I believe it is imperative to consider those foundational issues to properly resolve the case.
Some of these underlying issues include: What are the distinct jurisdictional authorities of the state vis-a-vis the family, and, thus, to what extent may the state be involved in a custody dispute? What standard of review should apply when the lower court disregards higher court standards and precedents? What is this Court’s proper response to a standard that appears to result in injustice? And by whom are the best interests of a child to be determined?
I write separately to consider these fundamental issues. I also write to show that under Alabama law the father did not voluntarily relinquish his right to sole custody of his son because he waited four months after his first opportunity to assert his right. And I join Justice Lyons in that portion of his writing dissenting from the finding that the father was unfit, which finding, I note, only a minority of this Court has chosen explicitly to uphold.
I.

Courts must recognize that the state is but one of several spheres of government, each with its distinct jurisdiction and limited authority granted by God.

Perhaps the first fundamental issue that should be considered in this case is the meaning of “government,” and the nature of its multiple jurisdictions as recognized by our nation’s Founders. This is because our understanding of government in general will largely determine our views of particular governments and their interactions, such as the extent of permissible state government involvement in family government matters, including child-custody disputes.
*675 America’s Founding Fathers understood the word “government” to possess a broader meaning than we usually acknowledge today, as seen clearly in Noah Webster’s original American Dictionary of the English Language, the definitive guide to English usage in the early American republic. Webster’s first definition of “government” is “[d]irection; regulation,” which he illustrates in terms of individual government: “These precepts will serve for the government of our conduct.” Webster also illustrates his second definition, “[c]ontrol; restraint,” in terms of individual government: “Men are apt to neglect the government of their temper and passions.” Webster’s third definition, “[t]he exercise of authority; direction and restraint exercised over the actions of men in communities, societies, or states,” is the broadest definition of government and applies to every sphere. Noah Webster, An American Dictionary of the English Language (Foundation for American Christian Education 1995) (1828).
Webster introduces a second government sphere, the family (or the household), with his fourth definition of government, “[t]he exercise of authority by a parent or householder,” which he illustrates with the following quote from Shepard Kollock: “Let family government be like that of our heavenly Father, mild, gentle, and affectionate.” It is only with Webster’s fifth definition of government, “[t]he system of polity in a state,” that he identifies the government sphere most recognized today — state (or civil) government. Lastly, Webster also recognizes the governing sphere of the church, which he defines in one entry as those “united under one form of ecclesiastical government.” Id.
Webster’s definitions demonstrate that our Founders thought in terms of a plurality of governments — including individual government and the covenantal governments of the family, the state, and the church — and not of state government alone. Each of these governments possesses its own exclusive jurisdiction of authority, constituting the original “separation of powers.” Thus the separation of powers among the spheres of governments is of a higher order and greater significance than the separation of powers within a particular sphere of government, as in the state government’s division into executive, legislative, and judicial branches. Consequently, courts must recognize and uphold the separation of powers among the various government spheres even more diligently than they already recognize and uphold the separation of powers within the state sphere of government.[14]
*676 Having acknowledged the historie meaning of government generally as well as having recognized the existence of the four particular government spheres, we should next consider how these governments relate to each other. Perhaps their most' fundamental connection is that they all possess grants of specific and limited, jurisdiction from the' ultimate source of all legitimate authority, God (see Romans 13:1-2 (“there is no authority except from God, and those that exist have been instituted by God”)), who as the Supreme Judge of the World is the final authority over all disputes among men as well as among all governments of men. (See Declaration of Independence.)
Another way in which these governments relate is that, although each sphere possesses a distinct and exclusive jurisdiction, the governments are not independent of each other but are interdependent. One way in which these governments are interdependent is through a hierarchy that reflects the order of their creation. Thus, individual government historically preexists family government. Moreover, because individuals make up families and because individual self-government is necessary for family government to exist and to function properly, individual government supports family government while retaining its own exclusive sphere of authority. Likewise, family government preexists and supports state government, while retaining its own exclusive sphere of authority. If parents do not train their children to respect authority at home, for example, they are less likely to respect authority in government outside the home. Similarly, church government is also composed of individuals and families that preexist and retain their own distinct governing authorities while recognizing and supporting the separate authority of church government.
Besides this mutually supportive role, the governments also provide a mutually corrective role. Thus, when individuals break covenant in one sphere of government, authorities in other spheres can take corrective action. If a parent exceeds the jurisdictional boundaries of family government — for example, by sexually abusing a child — state government may sanction the parent for child abuse in a temporal court of justice and, if the parent is a member of a local church, the government of that church may sanction the parent in a spiritual court. These mutually corrective jurisdictions may be understood as “checks and balances” among the governments, which doctrine, like that of the “separation of powers,” is of divine creation rather than human invention.
Our legal traditions have long recognized these distinct government spheres, their interrelations, and their separate jurisdictions, although not always using such terms. Thus, what we call “individual rights” may also be understood as the right of individuals to govern themselves. Likewise, what we call “parental rights” are the rights of parents to govern their children, which from ancient times were symbolized by the authority of the rod of corporal punishment. (See, e.g., Proverbs 13:24 (“He who spares the rod hates his son, but he who loves him is diligent to discipline him.”).) Similarly, the courts’ recognition of “religious rights” includes deference to the decisions of ecclesiastical authorities (see historical overview in Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331 (Ala.2002) (Moore, *677 C.J., dissenting)).[15] This sphere of church government has been symbolized by the keys of the kingdom. (See Matthew 16:19 (“I will give you the keys of the kingdom of heaven, and whatever you bind on earth shall be bound in heaven, and whatever you loose on earth shall be loosed in heaven.”).) State government also has its distinct sphere of authority or governing rights and ancient symbol, the sivord of justice. (See Romans 13:4 (“[The ruler] is God’s servant for your good. But if you do wrong, be afraid, for he does not bear the sword in vain.... ”).)[16]
To be sure, at different times in human history and in different places today, each of these legitimate government spheres has improperly exceeded its own lawful authority or even usurped the authority of another government. For example, during the French revolution, individual government exceeded its jurisdiction by executing vigilante “justice” on aristocrats who declined to placate the mob.[17] Likewise, whenever parents abuse or kill their children, such as the infanticide sanctioned by pagan Rome or the abortion sanctioned by shifting majorities of the United States Supreme Court, family government exceeds its authority. Similarly, during periods in European history, church government exceeded its proper jurisdiction and intruded into areas reserved for state government.
In modern times, however, the governing jurisdiction that most often exceeds its proper authority by usurpation is not the individual, the family, or the church, but the state. Because we live in an age in which such usurpation is so widespread that it has come to be commonly tolerated, this Court, as an organ of the state and, simultaneously, a minister of justice for all, must be especially vigilant to resist such usurpation in whatever guise it presents itself, even where it appears to favor the interests of a particular child.
II.

Because God, not the state, has granted parents the authority and responsibility to govern their children, parents should be able to do so unfettered by state interference.

In view of the above, each time a court considers a child-custody dispute it should begin by taking judicial notice of the fact that parents possess the right and responsibility to govern and raise their children; that God, not the state, has given parents these rights and responsibilities, and, consequently, that courts should interfere as little as possible with parental decision- *678 making, instead deferring to parental authority whenever it has not been fundamentally compromised by substantial neglect, wrongdoing, or criminal act.[18]
Explicit judicial acknowledgment of the source of parental rights is vital to preserve the vision and the reality of the state and society our Forefathers fought and died for, because many leaders in our society today reject the Founders’ view. They regard as anathema all calls to acknowledge God as the source of our rights and instead look to the state for “conferred” rights. But this statist view cannot be correct, for it converts our “rights” into mere privileges that endure only as long as supporters of these privileges maintain sufficient power in government. After all, if the state possesses the, authority to grant our “rights” it has the authority to take them away.
A recent ruling from the West Virginia Supreme Court of Appeals illustrates the consequences of converting God-given rights into state-granted privileges and thus underscores the importance of judicial acknowledgment of, and deference to, the true source of our rights. In Clifford K. v. Paul S., 217 W.Va. 625, 619 S.E.2d 138 (2005), West Virginia’s highest Court held that custody of a child should be awarded to a lesbian “partner” of a child’s deceased mother rather than to the child’s natural grandparents, because the lesbian was the child’s “psychological parent” and the child’s “second mother, by design” and “in actuality.” 217 W.Va. at 631, 619 S.E.2d at 158-59.
Several erroneous presuppositions underlie the West Virginia ruling. One is the presupposition that parental rights are mere licenses from the state, which may act through its judicial agent to alter or abolish them as it sees fit. Another erroneous presupposition is that the parental roles of father and mother are interchangeable, functional, and subjective rather than distinct, covenantal, and objective. Under this view, children need “caregivers” rather than a father and a mother; consequently, whoever gives the care is the “real parent.” Thus, one mother or two, one father or none, or a whole village — it matters not as long as the child receives “care.” These views of parenthood and parental rights are fundamentally incompatible with our Founders’ belief that inalienable rights, including parental rights, are given by God, who as the Creator determines their nature and limits.
Concerned that a trend of increasing state usurpation of family jurisdiction typified by the West Virginia ruling threatens Alabama parents as well, I welcome Justice Bolin’s “agree[ment]” in his special concurrence “that parents have a God-given right and responsibility to rear their children ... unfettered by state interference,” 924 So.2d at 667, and other Justices’ joining this judicial acknowledgment of the true source of parental authority and responsibility. Nevertheless, I remain troubled that more of my colleagues have not joined this explicit acknowledgment and that it is not matched in this case by action to repudiate the lower court’s extrajuris-dictional order.
To be sure, I recognize that even the most duly deferential court cannot completely avoid all state involvement in parental matters other than in the exceptions I stated above: cases of criminal behavior, substantial neglect, or other wrongdoing by parents. Yet where courts cannot avoid other involvement — such as custody *679 disputes unwed natural parents have brought to them — courts should rule as narrowly as possible so as to intrude as little as possible. And where a custody dispute is between a natural or biological parent and one who is not a parent, courts should strongly favor the natural parent.
The fundamental principles outlined above have been recognized by Alabama courts. Alabama appellate precedents do acknowledge that the right to parent one’s child is “a fundamental right,” K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003), “ordained” by “a higher authority.” Ex parte Sullivan, 407 So.2d 559, 563 (Ala.1981). Because our Creator established the parent-child relationship, “a fallible judge should disturb the relationship thus established only where circumstances compel.... ” 407 So.2d at 563-64. Thus, parental rights may be terminated only in the “most egregious of circumstances.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Because the right to custody of one’s child is a parental right, Alabama law recognizes the natural parent’s “prima fa-cie right to custody” over nonparents as “grounded in the common law concept that this primary parental right ... is in the best interest ... of the child as a matter of law.” Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983). Consequently, a natural parent’s prima facie right to custody may be defeated only when the natural parent is found unfit by clear and convincing evidence or where he or she acts to voluntarily relinquish this right to custody. Ex parte Terry, 494 So.2d 628, 630 (Ala.1986).
III.
To strip the father of custody of his child, the trial cowrt improperly alters the standards this Court set out in Ex parte Terry.
Perhaps because the applicable law and precedent so clearly require courts to minimize their involvement in matters of family government and parental authority, the trial court in the instant case does formally acknowledge the principle of the father’s prima facie right to custody, as stated in Ex parte Terry. But the trial court undermines this acknowledgment in practice by impermissibly altering the Ex parte Terry standard to strip the father of his right.
On the issue of fitness, for example, rather than meet the burden of proof of showing by clear and convincing evidence the father’s lack of fitness at the time of its ruling, the trial court’s order reveals an impermissible shift of the burden of proof to the father to prove that he is fit to have custody: “[The father] has succeeded in giving this court not one positive reason to place the child in his custody.” (Emphasis in original.) The lower court’s treatment of the father as unfit until proven fit is analogous to a court’s changing the governing standard in a criminal case to “guilty until proven innocent.”[19]
Similarly, the trial court’s treatment of “voluntary relinquishment of custody” also *680 involves an improper alteration of this Court’s standard to justify stripping the father of his right to custody. Although the trial court’s order initially cites the correct standard of voluntary relinquishment of custody, it invents a different standard when it finds “that both parents voluntarily abandoned their parental responsibilities.” (Emphasis added.)
To be sure, custody is a parental responsibility. But it is only one among many, and a parent conceivably could voluntarily abandon a dozen parental responsibilities, yet not voluntarily abandon the one parental responsibility — custody—that is specified by the Ex parte Terry standard at issue before us. That the trial court failed to find the requisite abandonment of custody is telling; that the court still stripped the father of his parental rights may be treated as conclusive proof of its judicial overreach.
I do not doubt that the trial court was sincerely motivated by what it regarded as the “best interest of the child” when it ordered the removal of the father’s right to custody. The best intentions, however, do not grant a lower court authority to alter the lawful judicial standards of this state. The best intentions also do not permit a lower court to employ those altered standards to strip the father of all custody rights when no party to the case so requested. That is because, absent such a request, the father has not received notice of the potential loss of all of his custody rights, and he has not had the opportunity to defend himself in court from that prospect.
Even the child’s maternal grandparents, who opposed the father’s petition for sole custody (and thus had every incentive to support a judicially imposed reduction or removal of the father’s rights), declined to petition the trial court to strip the father of all custody rights. The maternal grandparents recognized that the child’s interests would be served best by having his father at least continue to share custody. Because the grandparents recognized this despite their personal conflicts of interest, the trial judge should have deferred to their superior knowledge of the family circumstances, just as appellate courts ordinarily accord trial courts a presumption of correctness based on their relatively superior experience with a case.
IV.

By disregarding the proper legal standards, the lower court has effectively waived the presumption of correctness in this Court’s review of its decision.

As Justice Stuart stresses in the main opinion and Justice Bolin and Justice Smith reiterate in their special concurrences, in a child-custody case in which evidence is presented ore tenus, this Court ordinarily may not reweigh the evidence or substitute its judgment for that of the trial court. See Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996). Instead, as I noted above, the trial court is accorded a “presumption of correctness on appeal,” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), due, in the words of Chief Justice Moore, to “the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility.” Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
Although I agree with my colleagues in their summary of the law to this extent, I believe their recitation to be incomplete because it omits reference to the circumstance by which the lower court forfeits any presumption of correctness. As Justice Stuart wrote earlier this year, “The ore tenus rule does not ... cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.” Waltman v. *681 Rowell, 913 So.2d 1088, 1086 (Ala.2005) (citing Griggs v. Driftwood Landing, Inc., 620 So.2d 582, 586 (Ala.1993)). See, also, Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 418 (Ala.1994) (“When a trial court improperly applies the law to the facts, the presumption of correctness otherwise applicable to the trial court’s judgment has no effect.”). Instead, this Court’s review of conclusions of the law and the application of the law to the facts is de novo. Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996).
In the instant case, because the lower court impermissibly altered the standards established by this Court to reach the extrajurisdictional outcome it desired, it has arrived at incorrect conclusions of law and has improperly applied the law to the facts. It has, thereby, waived its right to a presumption of correctness upon this Court’s review.
Y.

Absent knowledge of a right to custody and intentional surrender of that right, there is no “voluntary relinquishment” of custody under Alabama law.

While mistakenly cloaking the trial court’s order in the instant case with a presumption of correctness, the main opinion upholds the trial court’s erroneous findings of voluntary relinquishment as sufficient justification to strip the father of his right to custody. Yet, reviewed de novo, the father’s acts clearly do not constitute “voluntary relinquishment of custody” under Alabama law.
In Alabama, an act of “voluntary relinquishment is ... essentially synonymous with the concept of ‘waiver,’ which [is] defined as the Voluntary and intentional surrender ... of a known right.’ ” Ex parte D.J., 645 So.2d 303, 306 (Ala.1994) (quoting Dominex, Inc. v. Key, 456 So.2d 1047, 1058 (Ala.1984)). “By definition ... a party ‘cannot waive a right of which he is unaware.’ ” Ex parte D.J., 645 So.2d at 306 (quoting Webb v. State, 539 So.2d 343, 353 (Ala.Crim.App.1987)). Thus, in Alabama, for a parent to voluntarily relinquish custody of his or her child, the parent: (1) must know he or she has a right to custody and (2) must voluntarily and intentionally act to give up that right of custody.
The main opinion fails to establish either of these two requirements, let alone both of them, to justify its claim that the record “contains ample evidence” to support the trial court’s finding that the father voluntarily relinquished custody of his son to the maternal grandparents.
VI.
The record contains ample evidence indicating that the unwed father did not know that he had a right to sole custody of his child.
The main opinion fails to show that the unwed father knew that he had the right to sole custody of his son at the time the main opinion claims he should have petitioned for it. In fact, the only evidence the main opinion supplies on this issue is evidence of the father’s lack of knowledge of his prima facie right to sole custody.
Quoting from the trial court’s ruling, the main opinion shows that the father lacked awareness of his rights as late as the start of the instant action: “[T]he father ‘fully admits he has waited until now to assert any rights he may have to this child.’ ” 924 So.2d at 655 (emphasis added). The record elsewhere supplies further evidence indicating that the father lacked awareness of his own custody rights. When asked why he did not take steps to obtain sole custody of his son at one point when the mother left the child for a time with the *682 maternal grandparents, the father replied, “I didn’t know what my rights were.[20]
At first blush, it may seem peculiar that a father would doubt his right to sole custody of his own infant child. But that is not so peculiar in a world in which courts have granted women the legal “right” to terminate the life of their pre-born children without even notifying the fathers, let alone obtaining their consent. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
These cases and their progeny are destructive of unity and mutuality in marriage because they ultimately stand for the doctrine that mothers’ rights trump fathers’ rights in marriage. And, if mothers’ rights are to be considered superior to fathers’ rights even when the parents of the child are married, how much more so when the parents are not wed? In such a context, it is quite understandable for the unwed father in the instant case to be unaware that he has any right to sole custody over an illegitimate child.
Whether one considers the father’s confessed ignorance of his parental rights to be reasonable, however, is beside the point, for reasonable ignorance is not the standard. Actual ignorance is the standard, and the record shows that the unwed father was in fact waware that he possessed any right to sole custody of his son. Consequently, under the controlling Ex parte D.J. standard, requiring “voluntary and intentional surrender” of a known right, and contrary to the main opinion, the father in this case could not have “waiv[ed] [the prima facie] right [to sole custody] of which he was unaware.”[21]
*683 VII.
The record contains ample evidence indicating that the father did not voluntarily and intentionally surrender his custody rights.
The record also supplies ample evidence indicating that the father did not act to “voluntarily and intentionally surrender” his right to custody. Instead, he increasingly asserted his custody rights over time so that, by the start of the proceedings in the instant case, he was petitioning the court for sole custody.
The father’s increased assertion of his rights over time occurred even though the mother initially avoided involving the father in the child’s life. She did not at first inform him of her pregnancy, and she did not tell him of the birth until after the delivery. Nonetheless, and although the father lived and worked out of state at the time, he did take the initiative to test for paternity and to petition the court to officially recognize him'as the father. The court did so and gave the child his father’s family name.[22]
The first time a question of custody arose in this case was in February 2002, when the child was two years old. Unbeknownst to the father, the maternal grandparents petitioned the court for temporary custody after the mother had refused to give them access to the child for a time. In a pendente lite order issued in April 2002, the court denied the maternal grandparents’ petition for custody, instead granting custody to the mother and giving the maternal grandparents only visitation rights. The father learned of this legal proceeding only after he received notice of the judge’s order. He then intervened and, as a result, initially was awarded regularly scheduled visitation with the child. Unsatisfied with mere visitation rights, however,, the father entered into negotiations to obtain custody and, through mediation, he, the mother, and the maternal grandparents came to an agreement in August 2002 that both parents should be awarded joint legal and physical custody. The trial court entered an order adopting that agreement. Tragically, however, in October 2002 the mother overdosed on heroin. The father and the maternal grandparents filed a petition with the trial court for emergency ex parte relief, seeking temporary removal of custody from the mother as a result of her inability to care for the child. The mother did not contest the petition, and the trial court granted it in November 2002, removing the mother’s joint custody rights and granting temporary joint custody to the maternal grandparents, while not disturbing the father’s preexisting joint custody rights. Then, in February 2003 — -after it had become clear that the mother would not soon be fit to regain joint custody and when the maternal grandparents asserted a superior right to custody over the father — the father took action to preserve his parental rights by petitioning the trial court for sole custody, which petition initiated the instant case.
Thus, the record shows a consistent pattern of behavior on the part of the father of voluntary petitions to the court for increased recognition of his paternal rights, *684 including the right to custody (initially joint and later sole), as he became aware of the extent of his rights as a father of an illegitimate child. This pattern of increased understanding and assertion of parental rights over time is exactly the opposite of what would be required for a legitimate finding of voluntary relinquishment.
In fact, the closest the record comes to showing that the father voluntarily relinquished his right to sole custody is delay in fully asserting that right. Specifically, the father waited for four months, from October 2002 until February 2003, to assert his full prima facie rights by petitioning the trial court for solé custody. Yet that delay is hardly unreasonable, given hopes that the mother would recover from her drug overdose and that her joint custody rights would be restored.[23]
Indeed, delaying legal action under the circumstances was a kindness to the mother and to the child. It was kindness to the mother, that she might not despair of complete loss of her child while recovering from the drug overdose. It was also a kindness to the child, already disturbed by a sudden loss of any interaction with his mother as a result of the overdose, because it allowed the child to remain in the comfortable familiarity of the maternal grandparents’ home.
Under the circumstances, if the father had done what the main opinion now says he should have done — that is, petitioned for sole custody the first instant it was possible — the trial court likely would have refused, understandably finding the advocacy of another such abrupt shock to the child to display a lack of concern for the child’s best interests. Thus, the holding of the main opinion forces the father into a Catch-22: he loses if he asserts his full custody rights as soon as possible or he loses if he delays as would be better for the child.
The holding of the main opinion not only puts the father in an impossible situation, but it also does so without any legal support and without any cited precedent of this Court.[24] The essence of this holding *685 is that one who possesses joint custody of a child and waits four months after the opportunity first presents itself to petition for sole custody has “knowingly,” “intentionally,” and “voluntarily” “surrendered” his right to any custody. This holding not only is unsupported but also is flatly contradicted by the authority of Ex parte D.J. Therefore, it is fundamentally unjust and should not stand.
VIII.

Avoiding the false dichotomy of parental rights versus a child’s safety, well-being, and welfare.

Justice Bolin’s special concurrence appears to imply that the diligent protection of parental rights at some point comes at the detriment of a child’s safety, well-being, and welfare, as though the two were mutually exclusive. I believe otherwise. In fact, I believe the best interests of a child are served by strengthening the state’s acknowledgment of, and deference to, parental rights, because God has specially and uniquely equipped parents to raise their children so that any parent who possesses at least some love can care for his or her child better than the state, which by its nature cannot love. Consequently, the best interests of children are served by the state’s declining to interfere with family government merely because its agents can, in individual eases, conceive of ways to improve the lot of a particular child.
I believe what may particularly trouble some of my colleagues in this case is that this Court’s current standard in Ex parte Terry, if faithfully applied, leads to an outcome they regard as unjust. Faced with upholding the standard and causing apparent injustice, or seeking justice at the cost of the standard, they have chosen the latter. Rather than directly acknowledge that our standard has been found wanting, however, they have honored it in form while gutting it in fact by following what I consider to be the lower court’s subversion of the standard. Although such an approach may appear to help in an individual case, it will cause more hurt than help in the end, because the subversion of the language of the law inevitably undermines the authority of the law.
There is a better way.' If an existing court standard is found to hinder rather than promote justice as defined by a higher authority, we may, and should, refine or, if needed, even replace, our standard. And one way to do so in a custody case like this one is to distinguish between those parents who have established their right to noninterference by the courts by founding their own family governments through marriage and those parents who have not. Recognizing such a distinction clarifies and corrects our standards with respect to determinations of voluntary relinquishment and fitness.
With respect to “voluntarily relinquishment,” natural parents who have founded family governments by marriage covenant should never be found by courts to have relinquished their custody or other parental rights apart from a definitive and unambiguous act such as a signed writing to that effect, as when children are given up *686 by natural parents for adoption. Natural parents who have not founded their own family governments by marriage covenant, however, have not established their right of state noninterference and thus should be subject to something akin to a “presumptive waiver” standard. Under such a standard, implied by the main opinion and special concurrences in this case, a non-married natural parent’s extended delay in fully asserting his or her parental rights may be treated as a waiver of those rights.
Similarly, with respect to court adjudication of parental fitness, married parents, as founders of a family government, should be able to raise their children unfettered by state government interference, whether by court or agency action. As the Ex parte Terry “clear and convincing” standard will sometimes too easily permit state interference in the separate jurisdiction of family government, its application at most should be limited to narrow, defined areas, specifically: neglect to the point of actual abuse, tortious wrongdoing, or criminal acts on the part of parents. State involvement in these specific areas is permissible, because in these cases parents have acted improperly outside their jurisdiction and thereby subjected themselves to the state’s sword of justice. Where an unwed natural parent has declined the separate jurisdictional protection afforded by marriage, by contrast, the courts should be free to apply the standard of review to any factor affecting fitness, as in the case before us.
I believe refining our standards to distinguish between married parents and unwed parents in the manner specified above increases justice for parents and children alike while simultaneously acknowledging and honoring the separate governing jurisdiction of the family established by our Creator. Moreover, by returning to first principles, the refined standard also avoids the false dichotomy of choosing between upholding family government by judicial non-interference and protecting children by necessary and lawful court involvement.
IX.

Conclusion.

I am very sympathetic to the hardships illegitimate children face in Alabama today, and I am particularly sympathetic to the circumstances of the child in the case before us. But the law recognizes that parental authority is ordained by God as a governing sphere distinct from that of the state and, consequently, that parents or guardians, not state officials or courts, generally know what is best for, and act in the best interest of, their children. Furthermore, my personal feelings of sympathy for the child in this case do not relieve me of my obligation to interpret and apply the law and lawful precedents as they have come down to us, absent a higher, superseding authority or clear error in the caselaw standards. And what has come down to us requires both a parent’s knowledge of a particular right to custody and an act intentionally and voluntarily forfeiting that custody for a finding of “voluntary relinquishment.” Because neither knowledge of a right to sole custody nor an intentional act is present in this case, the appropriate conclusion under Alabama law is that the trial court improperly invoked the standard to justify stripping the father of his right to custody of his son.
Furthermore, although I recognize that sound reasons may exist to justify the loss of an unwed father’s custody rights if he waits an extended period to assert them, that issue is not before this Court under applicable statute, precedent, or procedure in this case. But even if the issue were properly before this Court, we should not determine the outcome by upholding the lower court’s twisting of the plain legal meaning of the term “voluntary relinquish *687 ment.” Instead, we should apply the existing standard as is in this case and articulate a refined standard to apply in future cases. By giving parents, legal counsel, and the lower courts clear notice of changed standards, we promote in the law right ends as well as right means to those ends — both of which are necessary for justice to be maintained for adults and children alike.
Although the main opinion and the other special writings regrettably have not given explicit notice of what I regard to be a clear shift in this Court’s standards, I believe this case reveals an emerging consensus recognition that, in the words of Justice Bolin, parents possess a fundamental “God-given right and responsibility to rear their children ... unfettered by state interference,” 924 So.2d at 667, that this right is secured by parents who have established family governments by marriage covenant, and that unwed parents who fail to take responsibility to promptly assert their parental rights may be presumed to have waived them.

. Of the more than 7,100 released decisions included in the Court’s internal database covering primarily the past three years, this is the first case in which Justices of the Court have issued seven separate opinions.

. Our courts already give great deference to the separation of powers within the state sphere of government. See, e.g., Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham, 912 So.2d 204, 222 (Ala.2005) (Parker, J., concurring specially and emphasizing the right and responsibility of each of the branches of state government to interpret the Constitution for itself). Yet the Founders considered division of government power to be so vital for the preservation of liberty and justice that they separated state government power not only horizontally, among the legislative, executive, and judicial branches, but also vertically, between the states and the federal government.
In fact, the government of the United States was formed in a deliberate separation of powers by the states. The states delegated to the federal government powers that were particularly limited by their express enumeration as well as generally limited by the Tenth Amendment to the United States Constitution: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."
As our constitutional republic aligns the rights of the states with the rights of the people, it is unsurprising that as many of the rights of the states have been eroded or lost altogether so, too, have many of the people's rights been eroded or lost altogether. Thus, *676 those who would preserve and recover individual rights must be equally zealous to preserve and recover states’ rights and the rights of the other government spheres — the family and the church.

.Federal tax laws also reflect the state's recognition that the church is a distinct and independent sphere of government, accountable for its affairs to God rather than to the state. Thus, by statute churches are automatically "nontaxable.” They are not required to incorporate, to seek official recognition by the Internal Revenue Service ("the IRS”) to avoid paying federal taxes, or to file annually. (See 26 U.S.C. § 6033(a)(2)(A) and 26 U.S.C. § 508(c).) This is in contrast to every other kind of nonprofit organization, which must incorporate, must obtain IRS approval under a specific provision of the Internal Revenue Code (e.g., 26 U.S.C. § 501(c)(3)) before qualifying as "tax-exempt,” and must file annually to preserve that state-granted exemption.

. In the original Greek language, machairan, the word translated here as "sword,” referred specifically to the double-edged blade used for capital punishment. It represents the ultimate expression of the authority of the state, the proper jurisdiction of which is the execution of justice.

. See Edmund Burke, Reflections on the Revolution in France (1790)(contrasting the lawful means Americans used to achieve independence from Britain with the unlawful means the French revolutionaries used to overthrow their government).

. In the Declaration of Independence, our Founders declared that fundamental human rights are "endowed by our Creator" and thus "unalienable.” Article 1, § 1, Alabama Constitution 1901, similarly recognizes that our "inalienable” rights are from God.

. The main opinion contends that "in light of the detail in the trial court’s order,” this statement by the trial judge “does not indicate an improper shifting of the burden of proof” because it merely “indicates the trial court’s recognition that the father can present evidence to rebut the evidence indicating unfitness.” 924 So.2d at 660 n. 5. This interpretation is not persuasive, however, because the trial judge did not give the' father notice that his fitness for any custody at all was on trial.
As far as the father knew, the only issue at trial was his fitness for sole custody, because that is what he had petitioned the court for and because no other party in the case had requested that he lose the joint custody he then possessed. It was not until the trial judge's order that the father could have known of his prospective loss of all custody rights, at which time it was too late for him to “present evidence to rebut the evidence indicating unfitness [for any custody].”

. The main, opinion argues that the "admissions by the father [that he did not know what his rights were and did not investigate to find out] and his interaction with the legal system during the child’s first three years of life clearly establish that the father knew and had an opportunity to investigate and establish his right to custody of the child.” 924 So.2d at 659 n. 4. I agree that the record shows the father knew he had an opportunity to investigate his paternal rights. But this level of knowledge falls short of the governing Ex parte D.J. standard in two ways.
First, knowledge of an opportunity to investigate possible rights is not the same as knowledge of a right. Second, knowledge of the existence of paternal rights generally, or even knowledge of a right to joint custody, is not the same as knowledge of a right to sole custody, which is at issue in this case because the father already possessed, and had not relinquished, joint custody at the start of the proceedings in the instant case. In this case, although the record shows a father with some knowledge of his rights, it does not show, and the main opinion does not establish, that the father knew he had a prima facie right to sole custody following the mother’s drug overdose.

. The main opinion seeks to sidestep the requirement of Ex parte D.J., 645 So.2d at 306, that the father must be aware of his right before he can possibly relinquish it by stating that as a citizen the father "is charged with knowledge of the law.” 924 So.2d at 658 n. 4. In support of this statement, the main opinion cites Atkins v. Parker, 472 U.S. 115, 130-31, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985), for the proposition that our form of government "rests on the premise that the individual citizen is capable of informing himself about the particular policies affecting his destiny.”
Atkins is inapplicable to the instant case, however, for at least two reasons. First, the plaintiffs in Atkins faced a reduction in state-granted. benefits rather than a loss of God-given rights. Second, the plaintiffs in Atkins received actual notice of the planned benefits reduction and of the opportunity of a hearing to contest it, whereas the father in this case did not receive advance notice of the prospective loss of all his custody rights, because no party had requested it. Consequently, the father had no opportunity to contest such loss before the judge’s order depriving him of his rights.

. The main opinion considers it significant that the father did not consider it "a top priority” to petition the court to formally legitimate the child immediately after the paternity test he had requested confirmed that he was the father and also significant that the father "admitted” he did not even consider legitimation until his parents brought up the subject. I consider it more natural for the typical nonlawyer not to know that a court-sanctioned legitimation procedure has any special significance, because paternity in this case had already been established by science and because the common, historic understanding of legitimation is that it first requires marriage.

. The main opinion cites Ex parte D.J. for the proposition that the starting point for evaluating possible voluntary relinquishment of custody should be August 2000, when the probate court legally recognized the father’s paternity. However, Ex parte D.J. does not stand for this proposition; rather, it stands for the proposition that an unwed father who delays three years until the death of the child’s mother to initiate legitimation and custody proceedings does not voluntarily forfeit his prima facie right to custody over the maternal grandmother with whom the mother and child had lived if he initiates those proceedings soon after the mother's death.
Under Ex parte D.J., the time for a father to assert his presumptive right to custody should start running, for possible voluntary-relinquishment purposes, only after the mother has lost her custody because of the " 'strong presumption in Alabama’ " that " 'the mother of a child bom out of wedlock has a superior right of custody over all other persons,’ ” including the unwed father. 645 So.2d at 307 (quoting Rainer v. Feldman, 568 So.2d 1226, 1227 (Ala.1990)). According to the D.J. Court, the father’s "promptness in initiating legitimation proceedings and in seeking custody after [the mother’s] death conclusively rebuts any contention that he relinquished custody rights....” 645 So.2d at 307.
The promptness to which the D.J. Court refers was the start of legal action within three months of the mother's death. If three months was sufficiently prompt in a case in which it was clear the mother could never regain custody because she was dead, then four months, as in the case before us, should be considered sufficiently prompt where the mother yet lives.

. The closest the main opinion comes to supporting authority is its appeal to a nonbinding, lower-court case, K.C. v. D.C., 891 So.2d 346, 349 (Ala.Civ.App.2004), which found a father to have voluntarily relinquished custody in what the main opinion calls a "similar situation.” 924 So.2d at 658.
*685 However, the circumstances the main opinion calls “similar” include a delay of four years rather than four months in the father's assertion of his prima facie right to custody over the maternal grandparents following the mother's loss of her custody rights. During those years, moreover, the father in K.C. did not possess even joint custody, unlike the father here. I consider these differences to be material even if, arguen-do, one considers a lengthy delay in assertion of custody rights to be equivalent to voluntary relinquishment, which I do not.